FELEKEY v. A T & T                                    February 23, 2005

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---------------------------------x

ROBERT J. FELEKEY,

                    Plaintiff,

     -versus-                          :Civil Action No.
                                        3:02CV0091 (CFD)

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,

                    Defendant.

---------------------------------x            ORIGINAL


              Deposition of ROBERT J. FELEKEY, taken

pursuant to The Federal Rules of Civil Procedure, at the

law offices of Day, Berry & Howard LLP, CityPlace I,

185 Asylum Street, Hartford, Connecticut, before

Patricia Saya, LSR No. 37, a Registered Professional

Reporter and Notary Public in and for the State of

Connecticut, on February 23, 2005, at 9:35 a.m.

FELEKEY v. A T & T                                         February 23, 2005

Page 107

1   March 1st, Robert J. Felekey, client, business manager,

2   et cetera, has a new position in AT&T Solutions as

3   client services executive supporting the Pete Thompson

4   Sales Center." So I became -- I had a change of

5   assignment to AT&T Solutions.

6        Q.    Where were you before AT&T Solutions?

7        A.    I was physically in the same place in the

8   Global Sales Branch, working under the branch manager in

9   AT&T Global Sales.

10       Q.    So --

11       A.    February 28th, I was working for AT&T Global

12  Sales in the field sales force. March 1st I was working

13  in field sales for AT&T Solutions.

14       Q.    How does AT&T Solutions relate to AT&T Global

15  Sales?

16       A.    Well, at the time they were two parallel

17  divisions. Within a few months, they were merged as a

18  single division at AT&T.

19       Q.    So the at the time of your transfer, AT&T

20  Solutions was a --

21       A.    Division.

22       Q.    -- a co-division of AT&T Global Sales?

23       A.    Yes. It was another division of AT&T, yes.

24       Q.    Were you working in AT&T Global Sales straight

25  up until 1999?

FELEKEY v. A T & T                                    February 23, 2005

Page 111

1   to consider that.  I would say that this is a fraction

2   of the actual job responsibilities.  In particular, it

3   doesn't speak to the entire hunting process, which is a

4   critical part of sales, which is that you have to go and

5   find prospective clients.

6        Q.   My original question to you, Mr. Felekey, was:

7   What were your responsibilities in working for AT&T

8   Solutions, and you referred me to this job description.

9   So my question still remains:  What were your

10  responsibilities?  If this is a part of your

11  responsibilities, that is fine, but that doesn't answer

12  my question if your testimony is that this was only a

13  fraction of your responsibilities.

14            So let's go back to my original question,

15  which is:  In working for AT&T Solutions, what were your

16  responsibilities?

17       A.   My primary responsibility was to generate

18  outsourcing revenue for the corporation from companies

19  headquartered within Connecticut and Rhode Island and

20  all that that entails.

21       Q.   What do you mean by "outsourcing revenue"?

22       A.   We were in a division called AT&T Solutions

23  Outsourcing.  Outsourcing at that time was commonly used

24  to speak to activities which involved generally a large

25  corporation which had significant information

FELEKEY v. A T & T                                              February 23, 2005

Page 112

1   technology, resources, and employees, as well as

2   telecommunications resources, where control of those

3   resources and/or employees were transferred to a third

4   party that had specialized capabilities, such as AT&T

5   Solutions.

6        Q.    Did you have any other responsibilities aside

7   from generating outsourcing revenue from companies in

8   Connecticut and Rhode Island?

9        A.    Well, I had the continual obligation to

10  provide reporting on a weekly, if not daily, basis to my

11  management as to how the process was going, and also to

12  forecast future revenues, as impossible as that is, and

13  to guide the sales process from initiation to

14  completion.  These sales typically took 18 months or

15  more to come to fruition because of the complexity of

16  the dollar amounts and politics involved.

17       Q.    Did you have any other responsibilities in

18  your role at AT&T Solutions other than those that you

19  just described?

20       A.    Well, I think that pretty much covers it.

21       Q.    When you say you generated outsourcing revenue

22  for companies in Connecticut and Rhode Island, how did

23  you do that?

24            MR. SHEA:  I think that is really sort of

25  the beginning of another area.  Why don't we take our

FELEKEY v. A T & T                                    February 23, 2005

Page 113

1  break for lunch now?

2           MR. SUSSMAN:  If I could just get the

3  answer to that question, and then --

4           MR. SHEA:  I think it might take you the

5  rest of the afternoon to get an answer to that question.

6           MR. SUSSMAN:  Let's start with an answer,

7  and then we can move on with the follow-up after the

8  break.

9     A.    Could you repeat the question, please.

10          MR. SUSSMAN:  Could you read the question

11  back?

12          (Question read.)

13    A.    I was assigned to the branch, as the

14  organization announcement says, to support the branch

15  manager and the team members in the branch in creating

16  opportunities to generate revenue for AT&T in the

17  service areas encompassed by outsourcing; everything

18  from identifying opportunities to refining them, putting

19  these potential opportunities through extensive internal

20  reviews, and then ultimately contracting for the

21  services, doing the final negotiation, and then turning

22  it over to an implementation team.

23    Q.    When you say you were responsible for creating

24  opportunities, does that mean that you were responsible

25  for actually making the sale?

FELEKEY v. A T & T                                      February 23, 2005

Page 114

1       A.    Yes.

2       Q.    Was there a separate sales team at AT&T

3   Solutions?

4       A.    I was the sales team.  I was the member of the

5   sales team, the sole member of the sales team, for

6   Connecticut and Rhode Island.

7       Q.    So you were responsible for actually closing

8   the sales?

9       A.    Correct.

10            MR. SUSSMAN:  We can go ahead and take

11  our lunch break now.

12            (Lunch recess:  1:08 to 2:00 p.m.)

13      Q.    Mr. Felekey, I would like to return

14  momentarily to the $82,000 commission that we discussed

15  earlier.  You mentioned that after you filled out the

16  paperwork and John O'Brien approves it initially, it

17  then needs to go up the chain to become approved by

18  upper management; is that correct?

19      A.    That's correct.

20      Q.    That approval is approval of what, the payment

21  of $82,000?

22      A.    Correct.

23      Q.    As well as the distribution of that $82,000?

24      A.    That's correct.

25      Q.    Am I also correct in understanding your

FELEKEY v. A T & T                                    February 23, 2005

Page 136

1    missed my quota.

2        Q.    By how much?

3        A.    By 4, maybe 5 points.

4        Q.    Percentage points?

5        A.    Percentage points.  In 1997 I exceeded my

6    quota and became a member of the Gold Club for high

7    achievement sales professionals, and my wife and I were

8    treated to a 3-day vacation in Florida.

9              In 1998, every other member of my team met

10   the -- exceeded their quota because of an accounting

11   anomaly.  There were accounts included in my numbers,

12   which John O'Brien had spent a great deal of effort

13   trying to get transferred, from an accounting

14   standpoint, out of a branch which remained with him and

15   with me, so that we missed the pure number by a few

16   percentage points because no other branch manager would

17   accept those accounts, as I say.  Your earlier question

18   about responsibility, this only impacted me because of

19   the way the accounting system worked, and the other

20   members of my team below me received Gold Club status

21   for exceeding their objectives.

22       Q.    In 1998 you missed your quota by a few

23   percentage points?

24       A.    I missed the official quota by few percentage

25   points.

FELEKEY v. A T & T                                    February 23, 2005

Page 141

1   other multi-billion-dollar accounting system.

2        Q.    When you missed your quota in 1996, why did

3   you miss your quota?

4        A.    Because it was a transition year in which not

5   only I but my management changed in terms of staffing.

6   We were distracted by this transformation process, which

7   was a huge disruption of the sales force that external

8   consultants had sold to the company.  And the first 6

9   months of the year, my family was in New Jersey, and I

10  was commuting from New Jersey so my children could

11  remain in school for the rest of the school year.

12              Also, it was a major transition because the

13  entire product line, which I think consisted of 20,000

14  different sub items, was new to me, and I needed to go

15  through some training to understand what the domestic

16  product line was, because last time I had seen it was

17  1985, and of course, things had evolved in the interim.

18              I had to build a team.  There were various

19  retirements and changes in the team, so it is generally

20  accepted, I think -- and I could be wrong -- that there

21  are transition years when people make major career

22  changes within AT&T, and this was one for me.

23       Q.    Any other reasons why you missed your quota in

24  1996 other than the ones you mentioned?

25       A.    Those are the ones I can recall.

FELEKEY v. A T & T                                    April 21, 2005

Page 162

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x                ORIGINAL

ROBERT J. FELEKEY,

                Plaintiff,

    -versus-                                    :Civil Action No.
                               3:02CV0091 (CFD)
                                 Volume II

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                Continued Deposition of ROBERT J.

FELEKEY, taken pursuant to The Federal Rules of Civil

Procedure, at the law offices of Day, Berry & Howard

LLP, CityPlace I, 185 Asylum Street, Hartford,

Connecticut, before Patricia Saya, LSR No. 37, a

Registered Professional Reporter and Notary Public in

and for the State of Connecticut, on April 21, 2005, at

10:31 a.m.

FELEKEY v. A T & T                                        April 21, 2005

Page 165

1                MR. SUSSMAN:  Usual stipulations?  Read

2     and sign?

3                MR. SHEA:  Yes, please, continue.

4     R O B E R T    J .    F E L E K E Y ,

5     called as a witness, having been previously duly sworn

6     by Patricia Saya, a Notary Public in and for the State

7     of Connecticut, was examined and testified further on

8     his oath as follows:

9     DIRECT EXAMINATION

10    CONTINUED BY MR. SUSSMAN:

11         Q.    Good morning, Mr. Felekey.

12         A.    Good morning.

13         Q.    You testified at your last day of deposition

14    that you did not know whether you were eligible for the

15    VRIP in 1998.  Do you recall that testimony?

16         A.    I do.

17         Q.    Is that still your testimony?

18         A.    I am confused by it, yes.

19         Q.    You also testified that you received

20    documentation from the company about the VRIP?

21         A.    That's correct.

22         Q.    Did you choose to participate in the VRIP at

23    that time?

24         A.    I did not, no.

25         Q.    You had a midyear performance evaluation at

FELEKEY v. A T & T                                            April 21, 2005

Page 166

1    AT&T Solutions on August 25th, 1999; is that correct?

2         A.    Yes.

3                    (Defendant's Exhibit 1:    Marked for

4    Identification - described in Index.)

5         Q.    Showing you what has been marked as

6    Defendant's Exhibit 1, do you recognize that document,

7    sir?

8         A.    Yes.

9         Q.    Is this a complete copy of your written

10   evaluation from August 25th, 1999?

11        A.    That is what I was trying to determine here.

12   Yes.

13        Q.    Did you have a meeting in connection with this

14   review?

15        A.    Yes.

16        Q.    And who was present at that meeting?

17        A.    William Weijer, my supervisor.

18        Q.    Anyone else?

19        A.    No.

20        Q.    Was the meeting in person?

21        A.    Yes, in New Jersey, Florham Park, his office.

22        Q.    How long did the evaluation meeting last?

23        A.    Maybe 20 minutes, 25.

24        Q.    I would like you to tell me everything that

25   you can recall that was discussed.  I would like you to

FELEKEY v. A T & T                                                    April 21, 2005

Page 196

1      Q.     What is attached to that letter?

2      A.     Attached to the letter is a Performance
3  Improvement Plan.

4      Q.     When was the first time you saw Exhibit 3?

5      A.     Sometime after September 21st, when it was
6  delivered to me.

7      Q.     But you don't recall how long after September
8  21st?

9      A.     It wasn't September 21st.  It was 2, 3, 4 days
10 later.

11     Q.     Do you know who made the decision to put you
12 on this Performance Improvement Plan?

13     A.     I do not.

14     Q.     Were you aware at any time prior to September
15 21st, 1999 that you were going to be put on a
16 Performance Improvement Plan?

17     A.     As I recall, I was told that I needed to
18 provide input into a Performance Improvement Plan.

19     Q.     When were you told that?

20     A.     Sometime after August 205th.

21     Q.     But before September 21st?

22     A.     Again, had to be before September 21st because
23 this is dated September 21st.

24     Q.     But you don't recall exactly when between
25 August 25th and September 21st you were told that?

FELEKEY v. A T & T

April 21, 2005

Page 197

1       A.    No, not exactly.

2       Q.    Who told you that you needed to provide input

3  into a Performance Improvement Plan?

4       A.    Willem Weijer.

5       Q.    Did he tell you with any greater specificity

6  than that what he wanted you to provide?

7       A.    Not really, no.

8       Q.    Did you ask him what kind of input you were

9  supposed to provide?

10      A.    I probably did, yes.

11      Q.    Do you remember what he said?

12      A.    No.

13      Q.    Did you provide input into a Performance

14  Improvement Plan?

15      A.    I did.

16      Q.    When did you provide that input?

17      A.    I don't recall exactly.

18      Q.    Do you remember whether it was before

19  September 21st, 1999?

20      A.    Yes.  It was before September 21st.

21      Q.    But you don't recall how long before?

22      A.    No.

23      Q.    When Mr. Weijer told you that you needed to

24  provide input into a Performance Improvement Plan, what

25  did you say?

FELEKEY v. A T & T

April 21, 2005

Page 200

1   the statements in the letter were not accurate?

2       A.    On the Performance Improvement Plan form,

3   there is an opportunity for the employee to comment on

4   the Performance Improvement Plan.  I use that section to

5   explain to Willem and anyone else who cared to read it

6   that I received this letter after September 21st, was

7   told that there were to be a performance review 30 days

8   after the PIP began, and yet that PIP 30-day review was

9   scheduled less than 9 days after the letter was written.

10      Q.    Other than the statements that you made in

11  your section of the PIP that you just mentioned, did you

12  write to or tell Mr. Weijer in any other fashion that

13  you did not think the statements in his letter of

14  September 21st, 1999 were accurate?

15      A.    No.

16      Q.    Any reason why not?

17      A.    It didn't occur to me at the time.

18      Q.    Did you understand, based on what this letter

19  says, that Mr. Weijer was indeed going to review your

20  performance 30, 45, and 60 days following August 25th?

21      A.    No.  I understood this letter to say I will

22  review your performance at 30, 45 and 60 days after we

23  begin the PIP program, which this is the first notice I

24  got of what was in the PIP program.  And I received it

25  sometime after September 21st.

FELEKEY v. A T & T                                          April 21, 2005

Page 201

1       Q.    Did you understand, sir, that if your

2   performance did not satisfactorily improve, that your

3   employment could be terminated?

4       A.    That's one of the options, yes.

5       Q.    Did you understand that as of -- as of when

6   did you understand that?

7       A.    Could you repeat that again, please?

8       Q.    As of when did you understand -- as of what

9   time or date did you understand that if your performance

10  did not satisfactorily improve, your employment could be

11  terminated?

12      A.    At any of the 30, 45, or 60-day review

13  intervals after the plan was established.

14      Q.    I am asking you, as of when did you understand

15  that if your performance did not improve at those

16  intervals, that your employment could be terminated?

17      A.    After I received this letter.

18      Q.    But not before?

19      A.    As a manager, I understood that there was a

20  Performance Improvement Plan available to be used by me,

21  and apparently, be used for me, and that the company

22  policy was that there were a variety of potential

23  actions, up to and including dismissal.

24      Q.    And did you understand that it was up to AT&T

25  to determine whether your performance was satisfactory?

FELEKEY v. A T & T                                              April 21, 2005

Page 272

1    revised goals were incorporated into your Performance

2    Improvement Plan."

3            So he asked me to put together the measurable

4    things that I should be measured on.  I told him that.

5    He scaled them back.  They went into the PIP program,

6    and I reported on them as measures of success and my

7    achievement toward them on September 30th.

8        Q.    But are the 8 measures of success listed

9    here -- are those the scaled back measures or are those

10   the measures before they got scaled back?

11       A.    These are the scaled back ones that Willem

12   says were the ones I should focus on.

13       Q.    Okay.  In Exhibit 6, on the second page,

14   measures 7 and 8 under the "Achievement" column say

15   "TBD."  Do you see that?

16       A.    I do.

17       Q.    Did you write that?

18       A.    I did.

19       Q.    What does "TBD" mean?

20       A.    "To be done."

21       Q.    You were terminated on October 15th, 1999; is

22   that correct?

23       A.    That's correct.

24       Q.    Who told you you were being terminated?

25       A.    Willem Weijer.

FELEKEY v. A T & T                                      April 21, 2005

Page 279

1  individuals were.  I know you mentioned Bob Gebo and

2  Richard Spena.

3        A.    Let's start at the beginning, when I was hired

4  at AT&T, okay?  When I went to Cincinnati for 3 weeks of

5  initial sales training, various instructors -- whose

6  names I do not remember -- conveyed to me that this is a

7  great place to work, that we choose only the finest

8  applicants, that the fact you made it this far into

9  training is a real testament, and you are here for the

10  long term.  You make it through the training, and you

11  are basically here for life.  That was part of the

12  initial sales school in Cincinnati.

13        Q.    Without regard to the content of what they

14  said -- and Mr. Felekey, we will get to that, but for

15  now, if you could just identify the individuals who said

16  this?  To the extent that you can't recall the names, if

17  you have titles, if you have other information that can

18  simply identify those individuals.  So I hear you

19  saying --

20        A.    Instructors at the Cincinnati Sales School.

21        Q.    Who else besides those instructors made these

22  representations to you?

23        A.    Ben Lubecki, my first boss.

24        Q.    Anyone else?

25        A.    Every boss I had filled out a career plan --

FELEKEY v. A T & T                                           April 21, 2005

Page 280

1  let's say every boss I had was supposed to fill out a

2  career plan.  Most did, which projected 2, 3, 5 years

3  into the future my employment at the company.

4  Additionally, when I was sponsored into the Leadership

5  Continuity Program, which was designed only for future

6  leaders of AT&T, there were representations made.

7        Q.    By whom?

8        A.    By -- it has been a long time.  Jim Pagos was

9  the official corporate sponsor.  I was in his

10  organization.  David Way was my manager in Canada.

11        Q.    These are all individuals who made

12  representations to you concerning stability of

13  employment in general or with respect to you in

14  particular?

15        A.    Yes, because every year they wrote a forward

16  looking career plan.

17        Q.    And who else besides the individuals you have

18  already mentioned made these representations?

19        A.    I really have to tick through almost all the

20  bosses I had because this was consistent over 21 years,

21  and frankly, I don't remember all their names.  I would

22  have to check my files of the names of all the bosses I

23  had over 21 years, and each of whom wrote a career plan,

24  which indicated the next moves within AT&T, and you

25  know, what job band, what location, what year was

FELEKEY v. A T & T                                        April 21, 2005

Page 282

1  you can recall that Bob Gebo said to you that

2  constituted a representation concerning stability of

3  employment in general or for you in particular.

4       A.   Well, when Bob Gebo interviewed me in Albany

5  for the position of client business manager --

6       Q.   And when was that?

7       A.   That would have been November or December of

8  1995.

9       Q.   What happened?

10      A.   He agreed that I was the best available

11  candidate for the position of client business manager.

12  He agreed that he would start the paperwork going for

13  the AT&T movement -- AT&T relocation plan.  We would

14  authorize the AT&T relocation plan to move me to

15  Connecticut, and he later documented those two

16  activities.

17      Q.   What representations did he make to you, sir,

18  about stability of employment in general or for you in

19  particular?

20      A.   Well, since they had been trying to fill that

21  position for a long time and I was best available

22  candidate, it certainly led me to believe that the

23  company wanted to employ me, and the fact that they were

24  willing to move me to Connecticut was a further

25  investment for which I would have to rely upon them and

FELEKEY v. A T & T                                                  April 21, 2005

Page 285

1         A.    He said that I think this is going to be a

2    great fit because you have a unique set of skills,

3    having come from the branch, and that I wouldn't want to

4    ask you to move out of Connecticut and lose all those

5    contacts you made both in the market and within AT&T.

6         Q.    Any other representations?

7         A.    That's all I can remember.

8         Q.    You also indicated that various instructors in

9    Cincinnati at your initial training in -- I guess it was

10   1979; is that correct?

11        A.    Yes.

12        Q.    What representations did the Cincinnati

13   instructors make to you concerning stability of

14   employment in general or for you in particular?

15        A.    They indicated that even though the class who

16   was in attendance there had gone through a great deal of

17   selective screening to get this far, that it was

18   important that we participate and pass this training

19   phase because after this, we should expect to be working

20   with this company for quite a long time, that the

21   culture of this company was one in which it valued its

22   employees and treated them fairly, and that as long as

23   none of us violated the code of conduct and did our job,

24   we could expect a long, fruitful career.

25        Q.    Did the Cincinnati instructors made any other

FELEKEY v. A T & T

April 21, 2005

Page 286

1    representations to you concerning the stability of

2    employment in general or for you in particular?

3        A.    I seem to recall, you know, generally that

4    they talked about how expensive it was to educate us on

5    what an investment the company was making in us because

6    they believed that it would pay out over the long run.

7        Q.    Any other representations?

8        A.    We were told in our class that AT&T valued its

9    employees to the extent that from time to time, the

10   company would defend its employees, you know, as

11   necessary.

12       Q.    Any other representations by the Cincinnati

13   instructors concerning stability of employment in

14   general or for you in particular?

15       A.    They told us that when we left the training,

16   we will get you a job, and we passed all the courses,

17   that we would have received everything we need to be

18   successful in field sales and with this company.

19       Q.    Any other representations?

20       A.    I believe that covers it.

21       Q.    You also mentioned Ben Lubecki as someone who

22   made representations to you.  What representations did

23   Mr. Lubecki make to you concerning stability of

24   employment in general or for you in particular?

25       A.    At least annually he wrote an appraisal of my

FELEKEY v. A T & T                                    April 21, 2005

1   performance and a career plan and reviewed the code of

2   conduct with me and emphasized that violating the code

3   of conduct was potential for termination, that my

4   performance was superior, and that he -- at one point he

5   recommended me and accomplished a promotion for me.

6        Q.    Did Mr. Lubecki make any other representations

7   to you concerning stability of employment in general or

8   for you in particular?

9        A.    He emphasized to me, you know, on a frequent

10  basis that this was a long-term commitment on my part

11  and the company's, and at one point encouraged me to buy

12  a home based upon how well I was doing with the company.

13       Q.    Did he make any other representations to you

14  concerning stability of employment in general or for you

15  in particular?

16       A.    He supported me for a promotion, processed all

17  the paperwork, and helped me to achieve that promotion.

18       Q.    Any other representation?

19       A.    That's all I can recall.

20       Q.    What representations, if any, did Jim Pagos

21  make to you concerning stability of employment in

22  general or for you in particular?

23       A.    Jim Pagos personally awarded me for my

24  achievements at AT&T.  It was an award called the

25  Jim Pagos Award.  It was an award called the Team Award,

FELEKEY v. A T & T

April 21, 2005

Page 288

```
 1   T-e-a-m.  He signed off on my appraisals for a number of

 2   years and my career plans, and he sponsored me into the

 3   Leadership Continuity Program, which was limited to the

 4   top 5 percent of performers at AT&T who were chosen to

 5   receive special attention as the future leaders of AT&T.

 6        Q.    These were what you would consider

 7   representations concerning stability of employment?

 8        A.    Yes.

 9        Q.    Were there any other representations that he

10   made to you concerning stability of employment in

11   general or for you in particular?

12        A.    He agreed to my promotion as I returned from

13   Canada into his organization, and on March 1st of '99,

14   which was the introductory meeting with AT&T Solutions

15   at which the president, Rick Roscitt -- R-o-s-c-i-t-t --

16   after the meeting I said hello to him, and he

17   reintroduced me to Rick Roscitt, explained to him how

18   pleased he was that I had once again joined his

19   organization based upon the great work I had done for

20   him in the past, and how he continued to expect great

21   things from me in the future.

22        Q.    Did Mr. Pagos make any other representations

23   to you concerning stability of employment in general or

24   for you in particular?

25        A.    I believe that covers it.
```

FELEKEY v. A T & T                                                      April 21, 2005

Page 291

1    to you concerning stability of employment in general or

2    for you in particular?

3         A.    Well, he wrote the appraisals.    He wrote the

4    career plans.    He sponsored me to the LCP and sponsored

5    me on getting me on the promotable list and then

6    achieving my promotion and returning me to the United

7    States.    He also then wrote a letter in support of me in

8    the future, saying that he would gladly accept me back

9    into his organization when it was time for career

10   rotation.

11        Q.    Did you call David Way after Mr. Weijer told

12   you to start looking for other employment within AT&T?

13        A.    No.

14        Q.    Why not?

15        A.    Because he was in Florida working in a

16   different organization, and I had no desire to uproot my

17   family while my kids were in the middle of school.

18        Q.    Did Mr. Way make any other representations to

19   you concerning stability of employment in general or for

20   you in particular?

21        A.    Not that I can recall.

22        Q.    What representations did Ray Butkus make to

23   you regarding stability of employment in general or for

24   you in particular?

25        A.    As a manager, he wrote my appraisals.    He

FELEKEY v. A T & T                                        April 21, 2005

Page 292

1   wrote my career plans, indicating future plans were
2   being made for me.  He allowed me to represent my
3   manager at various staff meetings, to be in charge when
4   my manager was away, and when I was transferred to my
5   next manager, he wrote a brief but very nice reference
6   letter that says basically -- which I believe you have a
7   copy of -- that I had all the traits that were required
8   for future success and that he was very impressed with
9   my performance and that I had done a great job for him.
10          Q.    Any other representations that Mr. Butkus made
11  to you concerning stability of employment in general or
12  for you in particular?
13          A.    None that I can recall.
14          Q.    When did Mr. Butkus make these
15  representations?
16          A.    This is going to be tough to pin down.  I have
17  to do some mental math here.
18          Q.    Approximate dates are fine.
19          A.    Yes, I know.  Early '90s.
20          Q.    When did David Way make the representations
21  that you say he made to you?
22          A.    Prior to that, '96 to -- I'm sorry, '86 to
23  '89.  Probably '87 to '89.
24          Q.    You also mentioned that there are other
25  managers whose names you can't recall who also made

FELEKEY v. A T & T                                         April 21, 2005

Page 294

1    there would be a place at AT&T for me tomorrow.

2         Q.    Any other representations by these other

3    managers about stability of employment in general or for

4    you in particular that you can think of?

5         A.    The last -- any of the managers?

6         Q.    Any managers who made representations to you

7    concerning stability of employment in general or for you

8    in particular?

9         A.    Yes.  Well, through Rich Spena, I received a

10   document, which was the calculation of the pay

11   differential that AT&T Solutions would pay me to

12   compensate from leaving field sales commissions to going

13   to staff salary, and it indicated that for the next

14   12 months they would pay me a sum of money to make that

15   differential.

16        Q.    And you considered that to be a representation

17   concerning stability of employment?

18        A.    For at least the next 12 months, yes.  I mean,

19   the document said they would pay me this for the next

20   12 months.

21        Q.    And you took that to mean that you would also

22   be employed for the next 12 months?

23        A.    I assume that, yes.  I assumed that, yes, that

24   plus the fact that I had just gone through the 25th or

25   the 26th screening process at AT&T and was found to be

FELEKEY v. A T & T                                                April 21, 2005

Page 298

1     Q.    Jim Pagos?

2     A.    He rose through the ranks.  He was the vice

3  president of -- I guess he was the vice president of

4  International when I worked at headquarters, and he was

5  a vice president of AT&T Solutions when I joined AT&T

6  Solutions.

7     Q.    How about David Way?

8     A.    David Way was the country manager for Canada

9  when I worked for him in Canada.

10     Q.    How about Ray Butkus?

11     A.    Ray Butkus was the either division or director

12  of business services at headquarters.  I believe he

13  reported to Jim Pagos.  Tom Luciano was the boss who

14  accepted me into his organization and promoted me when I

15  came from Canada to repatriate to the United States.

16     Q.    Was he somebody who made representations to

17  you?

18     A.    Yes.  He was one of the bosses with the annual

19  appraisals, the --

20     Q.    Career plans?

21     A.    Career planning and to keep me on the

22  promotable list and support me in the LCP, so my

23  categories there.

24     Q.    He is encompassed in those representations?

25     A.    Yes.

FELEKEY v. A T & T                                                April 21, 2005

1       Q.    Paragraph 3 says that people made, quote,

2   "oral or written representations," unquote, to you.  We

3   have been through -- have we been through all the oral

4   representations?

5       A.    Well, in general, it was often the case at the

6   end of an appraisal, when I would ask, "What can I do

7   better?  Give me some advice.  How am I doing," "Fine.

8   Keep up the good work."

9             "How is this all working out?"

10            "Fine.  Keep on doing it," for 20 years.

11      Q.    What written representations are you claiming

12  were made?  Are you talking about your performance

13  appraisals and career plan?

14      A.    Performance appraisals career plan, Leadership

15  Continuity Program nominations and approvals, the whole

16  process of the Insight II Program, which was something

17  you got access to as a future leader of AT&T, and

18  letters of recommendation from former managers to

19  potential future managers as I transferred within and

20  about AT&T.

21      Q.    Have you produced all these documents?

22      A.    Yes.

23      Q.    Any other written representations?

24      A.    The expatriation/repatriation plan from

25  International.  When I moved to Canada, they had to

FELEKEY v. A T & T                                    April 21, 2005

Page 300

1  write a letter to the Canadian government in support of

2  me, that I would be a continued employee all the while I

3  was there.

4      Q.   Have you produced all of the documents that

5  contain the written representations that you claim

6  concern the stability of employment in general or

7  stability of employment for you in particular?

8      A.   Only the latter thing just occurred to me.  I

9  don't know that I produced a letter from International

10 Communications Services, but all the rest -- you have

11 all the appraisals, the LCP nominations, the career

12 plans, the letters of references.  You have all that.

13     Q.   So the only thing I don't have, as far as you

14 know, is the letter from International Communications

15 Services?

16     A.   Yes.

17             MR. SUSSMAN:  And if I could just get a

18 copy of that, Attorney Shea?

19             THE WITNESS:  I will see if I can find

20 it.

21             MR. SHEA:  If I have it.  I don't think I

22 ever remember seeing that.

23             THE WITNESS:  No.  It is just another

24 thing.  I mean, that has been 15 years ago.

25     Q.   Turning to paragraph 4 of your complaint, sir,

FELEKEY v. A T & T                                              April 21, 2005

Page 301

1    it says, Defendant through its agents, servants and

2    employees further represented that plaintiff's

3    employment would not be terminated except for just and

4    reasonable cause."

5            Do you see that?

6    A.    Yes.

7    Q.    Who were the individuals at AT&T who

8    represented to you that your employment would not be

9    terminated except for just and reasonable cause?  And

10   again, I am just looking at this point for the names.

11   A.    Essentially every one of my managers during

12   the annual code of conduct review.

13   Q.    And what did these managers say to you

14   specifically?

15   A.    Said it is very important that you read and

16   understand the code of conduct because this determines

17   grounds for asking you to leave the company.

18   Q.    Did they say anything else?  Again, when I

19   say, "Did they say anything else," I mean --

20   A.    Yes.  They would from time to time point out

21   case histories where someone was asked to leave the

22   company because they violated the code of conduct, and

23   they would use that as examples of things not to do if

24   you wanted to remain at AT&T.

25   Q.    And did any of these individuals make any

FELEKEY v. A T & T                                          April 21, 2005

Page 302

1  other representations to you in that regard?  Again, I

2  am talking about representations where somebody

3  communicated to you that your employment would not be

4  terminated except for just and reasonable cause.  And I

5  asked you a moment ago what did they say to you in

6  particular in that regard, and I am wondering if there

7  is anything else that they said to you in particular,

8  aside from making sure that you read and understood the

9  code of conduct and pointing out cases?

10      A.   Yes.  We were required to read -- quote --

11 understand and sign the code of conduct on an annual

12 basis, and that we were told that that would be placed

13 in our files, and any violation of the code of conduct

14 would be grounds for dismissal.

15      Q.   Any other representations that you can recall

16 by any of these managers?

17      A.   Well, you know, some of the representations

18 were implied in that I never heard of anybody being

19 released from the company except for a just and

20 reasonable cause, unless there was a downsizing, in

21 which case frequently they were offered early retirement

22 packages.

23           And every time a retirement package came out,

24 various HR officials or financial executives, whatever,

25 would issue a package saying that, you know, we have to

FELEKEY v. A T & T                                                April 21, 2005

Page 303

1   go through a significant force adjustment, and this is

2   the compensation that we are offering to employees.

3        Q.   Aside from the representations that you

4   already mentioned, were there any other representations

5   that you were told by managers to the effect that you

6   could only be terminated for just and reasonable cause?

7   In other words, what specifically did they tell you?

8        A.   As I recall, the AT&T policy manual laid out

9   steps that would be required by the company if someone

10  was determined -- if it was determined that someone

11  needed to be terminated and they went through, you know,

12  documentation of -- they outlined documentation of

13  activities.  They outlined corrective action taken and

14  what level of authority, you know, was required to

15  terminate someone.

16       Q.   Any other representations?

17       A.   None that I can recall.

18       Q.   Do you recall whether any managers at AT&T or

19  anyone at AT&T ever used the exact words that you have

20  got in paragraph 4 here, "just and reasonable cause"?

21  To your recollection, is there anyone that you can think

22  of at AT&T who ever said to you that your employment

23  would not be terminated except for just and reasonable

24  cause, using that exact terminology?

25       A.   As I sit here, I can't associate that phrase

FELEKEY v. A T & T

April 21, 2005

Page 304

1  to any particular answer, no.

2      Q.    If I could direct your attention to paragraph

3  12, please, paragraph 12 states, "Under the sales

4  commission agreement between plaintiff and defendant,

5  plaintiff was entitled to a sales commission of $82,000,

6  which should have been paid to plaintiff in January

7  1999."

8            Did I read that correctly?

9      A.    That's correct.

10     Q.    And we talked a bit about the $82,000

11 commission the last day of your deposition.  Do you

12 recall that?

13     A.    I do.

14     Q.    What sales commission agreement are you

15 referring to?

16     A.    At least annual -- excuse me.  At least

17 annually, the company creates a sales compensation plan

18 by job title, level, and those I guess location division

19 organizations -- a sales compensation plan which

20 outlines, basically as a contract would, if you do this,

21 we will do that.  And it outlines the process and

22 procedures in this case, where after a sale is made, the

23 person making the sales applies for the commission that

24 is due to them.

25            MR. SUSSMAN:  Could we have that marked

FELEKEY v. A T & T                                        April 21, 2005

Page 320

1   managers to attempt to correct behavior and performance

2   issues so as not to get into a potential termination

3   situation if there is performance issues because of the

4   value of AT&T employees and the investment that

5   employees -- that the company makes into employees.

6            And so the Performance Improvement Plan is

7   meant to be a tool to assist managers in correcting

8   employees' behavior and not primarily to be a tool to

9   terminate employees.

10       Q.   And you said that was in the management

11  handbook?

12       A.   Yes.

13       Q.   Is that what it is called, the management

14  handbook?

15       A.   I don't know exactly.  You know, it is

16  probably called "AT&T Employee Managers Handbook" or

17  something like that.  I haven't seen it in 6 years.

18       Q.   Do you have a copy of it?

19       A.   You know, a new one was issued every year.  I

20  don't have copies of 20 years worth of them.

21       Q.   Do you have a copy of any year?

22            THE WITNESS:  Did I supply a copy to you?

23            MR. SHEA:  I don't think that we have a

24  copy.

25            MR. SUSSMAN:  I haven't received a copy.