Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

---------------------------------x

ROBERT J. FELEKEY,

        Plaintiff,

  -versus-                              :Civil Action No.
                                   3:02CV0091 (CFD)

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,

        Defendant.

---------------------------------x

**ORIGINAL**

        Deposition of ROBERT J. FELEKEY, taken pursuant to The Federal Rules of Civil Procedure, at the law offices of Day, Berry & Howard LLP, CityPlace I, 185 Asylum Street, Hartford, Connecticut, before Patricia Saya, LSR No. 37, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on February 23, 2005, at 9:35 a.m.

1  exposed to, and you know, perhaps some comparison to the
2  way other people had been treated and the way that I was
3  treated.
4      Q.   And what did Mr. Coffin say?
5      A.   He said yes, he would be willing to
6  participate in this action by filling out an affidavit.
7      Q.   Was there any conversation with any of these
8  gentlemen; whether Mr. Jubert, Mr. Celic, Mr. Lubecki,
9  Mr. Coffin, Mr. Schmieg, Mr. Brownell, or
10 Mr. Cunningham, about who would be drafting these
11 affidavits?
12     A.   About who would be drafting the affidavits,
13 yes.
14     Q.   What was the nature of that conversation?
15     A.   They asked where would they begin, and I said,
16 "Well, how about if I put together some ideas and send
17 it to you, and then you modify that based upon your
18 recollection and your comfort and experience?"
19     Q.   Did you do that?
20     A.   I did.
21     Q.   Did you do that for all of those gentlemen?
22     A.   I did not do it for Matt Brownell.  I did not
23 do it for Vince Cunningham.
24     Q.   You didn't do it for Mr. Cunningham because he
25 didn't sign an affidavit?

1      A.    Right.
2      Q.    Why didn't you do it for Mr. Brownell?
3      A.    Because we only recently spoke about the
4  subject.
5      Q.    Do you intend to provide Mr. Brownell
6  something in writing for purposes of his affidavit?
7      A.    I would like to do that, yes.
8      Q.    Did you retain copies of the information that
9  you sent to these gentlemen concerning your thoughts
10 about what they might put in their affidavits?
11     A.    I may have some electronic files.
12     Q.    Did you send it to them via e-mail?
13     A.    Yes.
14     Q.    Is that true of all of them; all of the ones
15 that you sent the information to, that is?
16     A.    I have to think about that.  Yes.
17     Q.    So you have at least some e-mail
18 correspondence back and forth with all of the gentlemen
19 who agreed to sign affidavits?
20     A.    Yes.
21     Q.    Do you have any e-mail correspondence with
22 Mr. Cunningham?
23     A.    No.
24     Q.    In terms of the information that you sent to
25 the gentlemen to whom you sent information, was it the

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

ROBERT J. FELEKEY,

        Plaintiff,

  -versus-                  :Civil Action No.
                         3:02CV0091 (CFD)
                           Volume II

AMERICAN TELEPHONE AND
TELEGRAPH COMPANY,

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

        Continued Deposition of ROBERT J. FELEKEY, taken pursuant to The Federal Rules of Civil Procedure, at the law offices of Day, Berry & Howard LLP, CityPlace I, 185 Asylum Street, Hartford, Connecticut, before Patricia Saya, LSR No. 37, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on April 21, 2005, at 10:31 a.m.

1  anticipated I would be either promoted or given an
2  assignment, and as a separate category those people that
3  were involved for several years in the leadership
4  continuity program, which David Way was my manager.
5        And Tom Luciano was one of my managers, and
6  Jim Pagos, as I mentioned, and Ray Butkus --
7  B-u-t-k-u-s -- you know, stated that I had a great
8  future with the company, and other managers whose names
9  I can't put together at this moment.
10    Q.   Let's start with Bob Gebo.
11    A.   Let me just add one other category. You know,
12 I was offered several corporate moves, company sponsored
13 moves, including two categories, company sponsored
14 moves, you know, where they encouraged me to take on a
15 25 or 30-year mortgage based upon expectation of
16 continuing employment with AT&T and the International
17 Communications Services Group management, who encouraged
18 me to leave the United States and move with my family to
19 Canada on the assurance that I would be employed there
20 and they would repatriate me.
21    Q.   Were you repatriated?
22    A.   I was. I am here now.
23    Q.   Let's start with Bob Gebo.
24    A.   Yes.
25    Q.   I would like you to tell me everything that

1  you can recall that Bob Gebo said to you that
2  constituted a representation concerning stability of
3  employment in general or for you in particular.
4      A.   Well, when Bob Gebo interviewed me in Albany
5  for the position of client business manager --
6      Q.   And when was that?
7      A.   That would have been November or December of
8  1995.
9      Q.   What happened?
10     A.   He agreed that I was the best available
11 candidate for the position of client business manager.
12 He agreed that he would start the paperwork going for
13 the AT&T movement -- AT&T relocation plan.  We would
14 authorize the AT&T relocation plan to move me to
15 Connecticut, and he later documented those two
16 activities.
17     Q.   What representations did he make to you, sir,
18 about stability of employment in general or for you in
19 particular?
20     A.   Well, since they had been trying to fill that
21 position for a long time and I was best available
22 candidate, it certainly led me to believe that the
23 company wanted to employ me, and the fact that they were
24 willing to move me to Connecticut was a further
25 investment for which I would have to rely upon them and

1  make my own decision, such as schools and buying a home
2  and obtaining a mortgage, based upon my belief that I
3  would be employed by the company.
4      Q.   What were the representations though, sir,
5  that he made to you with respect to stability of
6  employment, whether in general or for you in particular?
7      A.   I think those were the ones.
8      Q.   What representations did Richard Spena make to
9  you about stability of employment in general or for you
10 in particular?
11     A.   During the hiring process, hiring
12 negotiations, when it got -- when it became clear that I
13 was strongly recommended and strongly considered for the
14 position, I asked Rich Spena if it would be a problem if
15 I remained in Connecticut, if I could expect to remain
16 in Connecticut, as I said, throughout the middle school
17 and high school years at a minimum, which would be
18 7 years for my children, that my wife was frustrated in
19 moving around every 3 or 4 years, and I had no desire
20 taking another position that required me to move.
21          He said, "That is not going to be a problem.
22 We are going to fill this position. You are the best
23 available candidate." And then he documented that, and
24 they hired me. And he said we would have another
25 negotiation over discussion if it became necessary to

1  ask you to move to New Jersey on promotion, but as far
2  as we have planned, this position is going to be in
3  Connecticut, in the Farmington branch, for the
4  foreseeable future.
5       Q.   When did he make these representations to you?
6       A.   February of 1999.
7       Q.   Did he make any other representations to you,
8  Mr. Felekey, concerning stability of employment in
9  general or for you in particular?
10      A.   I also questioned him about the salary and
11 because it was a substantial cut in pay, and he said
12 that when we have your annual review, we will certainly
13 revisit that, and I expect that there will be something
14 we will be able to do for you in a year's time or
15 whenever that -- review it from a paid performance
16 standpoint.
17      Q.   I am not asking about --
18      A.   What I am saying is that he expected I would
19 be there for performance discussion in about a year's
20 time, and that then they could true up some of the
21 salary discrepancies. I took that to mean that they
22 were hiring me for the long haul.
23      Q.   Did he make any other representations to you
24 concerning stability of employment in general or for you
25 in particular?

1  A.  He said that I think this is going to be a
2  great fit because you have a unique set of skills,
3  having come from the branch, and that I wouldn't want to
4  ask you to move out of Connecticut and lose all those
5  contacts you made both in the market and within AT&T.
6  Q.  Any other representations?
7  A.  That's all I can remember.
8  Q.  You also indicated that various instructors in
9  Cincinnati at your initial training in -- I guess it was
10 1979; is that correct?
11 A.  Yes.
12 Q.  What representations did the Cincinnati
13 instructors make to you concerning stability of
14 employment in general or for you in particular?
15 A.  They indicated that even though the class who
16 was in attendance there had gone through a great deal of
17 selective screening to get this far, that it was
18 important that we participate and pass this training
19 phase because after this, we should expect to be working
20 with this company for quite a long time, that the
21 culture of this company was one in which it valued its
22 employees and treated them fairly, and that as long as
23 none of us violated the code of conduct and did our job,
24 we could expect a long, fruitful career.
25 Q.  Did the Cincinnati instructors made any other

1   performance and a career plan and reviewed the code of
2   conduct with me and emphasized that violating the code
3   of conduct was potential for termination, that my
4   performance was superior, and that he -- at one point he
5   recommended me and accomplished a promotion for me.
6      Q.   Did Mr. Lubecki make any other representations
7   to you concerning stability of employment in general or
8   for you in particular?
9      A.   He emphasized to me, you know, on a frequent
10  basis that this was a long-term commitment on my part
11  and the company's, and at one point encouraged me to buy
12  a home based upon how well I was doing with the company.
13     Q.   Did he make any other representations to you
14  concerning stability of employment in general or for you
15  in particular?
16     A.   He supported me for a promotion, processed all
17  the paperwork, and helped me to achieve that promotion.
18     Q.   Any other representation?
19     A.   That's all I can recall.
20     Q.   What representations, if any, did Jim Pagos
21  make to you concerning stability of employment in
22  general or for you in particular?
23     A.   Jim Pagos personally awarded me for my
24  achievements at AT&T.  It was an award called the
25  Jim Pagos Award.  It was an award called the Team Award,

```
 1   T-e-a-m.  He signed off on my appraisals for a number of
 2   years and my career plans, and he sponsored me into the
 3   Leadership Continuity Program, which was limited to the
 4   top 5 percent of performers at AT&T who were chosen to
 5   receive special attention as the future leaders of AT&T.
 6       Q.   These were what you would consider
 7   representations concerning stability of employment?
 8       A.   Yes.
 9       Q.   Were there any other representations that he
10   made to you concerning stability of employment in
11   general or for you in particular?
12       A.   He agreed to my promotion as I returned from
13   Canada into his organization, and on March 1st of '99,
14   which was the introductory meeting with AT&T Solutions
15   at which the president, Rick Roscitt -- R-o-s-c-i-t-t --
16   after the meeting I said hello to him, and he
17   reintroduced me to Rick Roscitt, explained to him how
18   pleased he was that I had once again joined his
19   organization based upon the great work I had done for
20   him in the past, and how he continued to expect great
21   things from me in the future.
22       Q.   Did Mr. Pagos make any other representations
23   to you concerning stability of employment in general or
24   for you in particular?
25       A.   I believe that covers it.
```

1    Q.    When did Mr. Pagos make these representations?
2    A.    The last one was made on March 1st of 1999, as
3    I stated.
4    Q.    And did he make representations prior to that
5    as well?
6    A.    As I said, he had awarded me a number of
7    awards.
8    Q.    What time frame did this cover, these
9    representations?
10   A.    In the mid 1990s, I came to -- well, let's say
11   from 1990 to '96, approximately.
12   Q.    Then he made other representations, you are
13   saying, in 1999?
14   A.    Yes, because I left his organization and then
15   I rejoined his organization.
16   Q.    And the representations by Mr. Lubecki
17   concerning stability of employment, when were those
18   made?
19   A.    1979 to 1984, '85, in that range.
20   Q.    What representations did David Way make to you
21   concerning stability of employment in general or for you
22   in particular?
23   A.    David Way was a manager sponsor, if you will,
24   of me and my career. He pushed very hard to get me
25   admitted into the Leadership Continuity Program, which

1  was the program for the top 5 percent of AT&T employees.
2  It was a special identification and training program for
3  the future leaders of AT&T. And he also worked very
4  hard to get me promoted as I left working for him in
5  Canada and returned to New Jersey. He wrote career
6  plans which extended 3 or more years into the future as
7  to his best estimates of the fit between myself and the
8  company.
9      Q.   Do you have any copies of these career plans
10 that you have been referencing?
11     A.   I believe they have been delivered to you.
12          MR. SHEA:  I believe they have.
13     A.   There are appraisals and there are career
14 plans.
15          MR. SHEA:  Both.
16     Q.   So they go along with the appraisals?
17     A.   Yes. There was an annual cycle for both of
18 them. So the long and the short of it is for almost
19 20 years, if you are talking about forecasting, my
20 managers forecasted that I would be with the company for
21 various years in the future, and all these top level
22 committees that decided who was the top 5 percent of
23 employees of AT&T chose me and enlisted me in the LCP
24 program for a number of years.
25     Q.   Any other representation that David Way made

1  to you concerning stability of employment in general or
2  for you in particular?
3      A.    Well, he wrote the appraisals.  He wrote the
4  career plans.  He sponsored me to the LCP and sponsored
5  me on getting me on the promotable list and then
6  achieving my promotion and returning me to the United
7  States.  He also then wrote a letter in support of me in
8  the future, saying that he would gladly accept me back
9  into his organization when it was time for career
10 rotation.
11     Q.    Did you call David Way after Mr. Weijer told
12 you to start looking for other employment within AT&T?
13     A.    No.
14     Q.    Why not?
15     A.    Because he was in Florida working in a
16 different organization, and I had no desire to uproot my
17 family while my kids were in the middle of school.
18     Q.    Did Mr. Way make any other representations to
19 you concerning stability of employment in general or for
20 you in particular?
21     A.    Not that I can recall.
22     Q.    What representations did Ray Butkus make to
23 you regarding stability of employment in general or for
24 you in particular?
25     A.    As a manager, he wrote my appraisals.  He

1  wrote my career plans, indicating future plans were
2  being made for me. He allowed me to represent my
3  manager at various staff meetings, to be in charge when
4  my manager was away, and when I was transferred to my
5  next manager, he wrote a brief but very nice reference
6  letter that says basically -- which I believe you have a
7  copy of -- that I had all the traits that were required
8  for future success and that he was very impressed with
9  my performance and that I had done a great job for him.
10     Q.   Any other representations that Mr. Butkus made
11 to you concerning stability of employment in general or
12 for you in particular?
13     A.   None that I can recall.
14     Q.   When did Mr. Butkus make these
15 representations?
16     A.   This is going to be tough to pin down. I have
17 to do some mental math here.
18     Q.   Approximate dates are fine.
19     A.   Yes, I know. Early '90s.
20     Q.   When did David Way make the representations
21 that you say he made to you?
22     A.   Prior to that, '96 to -- I'm sorry, '86 to
23 '89. Probably '87 to '89.
24     Q.   You also mentioned that there are other
25 managers whose names you can't recall who also made

1  there would be a place at AT&T for me tomorrow.
2      Q.   Any other representations by these other
3  managers about stability of employment in general or for
4  you in particular that you can think of?
5      A.   The last -- any of the managers?
6      Q.   Any managers who made representations to you
7  concerning stability of employment in general or for you
8  in particular?
9      A.   Yes. Well, through Rich Spena, I received a
10 document, which was the calculation of the pay
11 differential that AT&T Solutions would pay me to
12 compensate from leaving field sales commissions to going
13 to staff salary, and it indicated that for the next
14 12 months they would pay me a sum of money to make that
15 differential.
16     Q.   And you considered that to be a representation
17 concerning stability of employment?
18     A.   For at least the next 12 months, yes. I mean,
19 the document said they would pay me this for the next
20 12 months.
21     Q.   And you took that to mean that you would also
22 be employed for the next 12 months?
23     A.   I assume that, yes. I assumed that, yes, that
24 plus the fact that I had just gone through the 25th or
25 the 26th screening process at AT&T and was found to be

1  the best available candidate for a position that they
2  had advertised for months, and I had the recommendation
3  of my former boss.  So I mean, you know, there are peaks
4  and valleys in your attitude and in your confidence
5  within the company, but when you were just hired into a
6  position, and they tell you you are the best
7  available -- and I mean, it takes a lot of time and
8  effort to hire people in these positions -- you get the
9  impression that they are making a commitment to you.
10      Q.   Aside from the individuals you already
11 mentioned, as well as the various managers whose names
12 you can't necessarily recall, was there anyone else at
13 AT&T who made any representations to you concerning
14 stability of employment in general or for you in
15 particular aside from those you have already mentioned?
16      A.   Right.  Well, you know, we would get all kinds
17 of corporate information, stressing the value of our
18 benefits and emphasizing what you would receive as a
19 long-term employee of AT&T and how we ought to keep that
20 in mind when we consider alternative offers and how we
21 ought to add the value of those benefits in our
22 calculations of what we do for our careers.
23      Q.   Do you have any of those documents?
24      A.   I have something regarding the value of your
25 benefits.  It seemed like every year, you know, a

1  it says, Defendant through its agents, servants and
2  employees further represented that plaintiff's
3  employment would not be terminated except for just and
4  reasonable cause."
5            Do you see that?
6       A.   Yes.
7       Q.   Who were the individuals at AT&T who
8  represented to you that your employment would not be
9  terminated except for just and reasonable cause?  And
10 again, I am just looking at this point for the names.
11      A.   Essentially every one of my managers during
12 the annual code of conduct review.
13      Q.   And what did these managers say to you
14 specifically?
15      A.   Said it is very important that you read and
16 understand the code of conduct because this determines
17 grounds for asking you to leave the company.
18      Q.   Did they say anything else?  Again, when I
19 say, "Did they say anything else," I mean --
20      A.   Yes.  They would from time to time point out
21 case histories where someone was asked to leave the
22 company because they violated the code of conduct, and
23 they would use that as examples of things not to do if
24 you wanted to remain at AT&T.
25      Q.   And did any of these individuals make any

1  go through a significant force adjustment, and this is
2  the compensation that we are offering to employees.
3       Q.   Aside from the representations that you
4  already mentioned, were there any other representations
5  that you were told by managers to the effect that you
6  could only be terminated for just and reasonable cause?
7  In other words, what specifically did they tell you?
8       A.   As I recall, the AT&T policy manual laid out
9  steps that would be required by the company if someone
10 was determined -- if it was determined that someone
11 needed to be terminated and they went through, you know,
12 documentation of -- they outlined documentation of
13 activities.  They outlined corrective action taken and
14 what level of authority, you know, was required to
15 terminate someone.
16      Q.   Any other representations?
17      A.   None that I can recall.
18      Q.   Do you recall whether any managers at AT&T or
19 anyone at AT&T ever used the exact words that you have
20 got in paragraph 4 here, "just and reasonable cause"?
21 To your recollection, is there anyone that you can think
22 of at AT&T who ever said to you that your employment
23 would not be terminated except for just and reasonable
24 cause, using that exact terminology?
25      A.   As I sit here, I can't associate that phrase

1  to any particular answer, no.
2      Q.   If I could direct your attention to paragraph
3  12, please, paragraph 12 states, "Under the sales
4  commission agreement between plaintiff and defendant,
5  plaintiff was entitled to a sales commission of $82,000,
6  which should have been paid to plaintiff in January
7  1999."
8           Did I read that correctly?
9      A.   That's correct.
10     Q.   And we talked a bit about the $82,000
11 commission the last day of your deposition.  Do you
12 recall that?
13     A.   I do.
14     Q.   What sales commission agreement are you
15 referring to?
16     A.   At least annual -- excuse me.  At least
17 annually, the company creates a sales compensation plan
18 by job title, level, and those I guess location division
19 organizations -- a sales compensation plan which
20 outlines, basically as a contract would, if you do this,
21 we will do that.  And it outlines the process and
22 procedures in this case, where after a sale is made, the
23 person making the sales applies for the commission that
24 is due to them.
25          MR. SUSSMAN:  Could we have that marked