**ORIGINAL**

IN THE MATTER OF:

# Robert J. Felekey
## vs.
# AT&T

Cause No. 3:02CV0091

Deposition of Benjamin W. Lubecki
4/19/2005

Gore Perry Gateway & Lipa Reporting
515 Olive Street
Suite 700
St. Louis, MO 63101

```
 1        Q:  Who drafted this affidavit?
 2        A:  The affidavit was drafted by Bob and, I
 3   assume, his attorney, based on my conversations with
 4   him.
 5        Q:  Did it go through more than one draft?
 6        A:  There was an iteration sent to me that was
 7   changed by me, so that it conformed with what I
 8   believed was the conversation that I had with Bob
 9   Felekey prior to it being drafted.
10        Q:  And what was the change that you made?
11        A:  It was just basically where some training
12   was accomplished and things of that nature.
13        Q:  Do you recall either in words or in
14   substance what the initial version had said?
15        A:  I think there was -- there was no real
16   reference to -- I think there was no real reference
17   to Kansas City and the role of Kansas City or
18   something of that nature, but you know, that's where
19   the original orientation takes place, in Kansas
20   City.
21        Q:  Okay.  You indicated a moment ago that you
22   changed the affidavit to conform with your
23   conversation with Mr. Felekey; is that correct?
24        A:  That's correct.
25        Q:  Okay.  What is it about the initial
```

| | |
|---|---|
| 1 | **A:** Yes. |
| 2 | **Q:** Okay. Mr. Lubecki, was it your |
| 3 | understanding that those were the only three bases |
| 4 | for termination of employment? |
| 5 | **A:** Oh, no. You know, there's other reasons |
| 6 | for -- you know, for cause. I mean, there are, you |
| 7 | know, lack of performance and things of that nature, |
| 8 | but no, that's not the only reasons. |
| 9 | **Q:** Okay. You mentioned lack of performance as |
| 10 | one other reason? |
| 11 | **A:** Uh-huh. |
| 12 | **Q:** Is that a yes? |
| 13 | **A:** Yes. |
| 14 | **Q:** Okay. |
| 15 | **A:** Yes, I'm sorry. |
| 16 | **Q:** What other reasons can you think of were |
| 17 | there that somebody could be terminated? |
| 18 | **A:** If, you know, you were discriminating, if |
| 19 | you discriminated against others. You know, it's |
| 20 | basically a violation of the code of conduct, were |
| 21 | the areas that, you know -- out-and-out |
| 22 | insubordination. I mean, those kinds of things were |
| 23 | always, you know, grounds for some sort of |
| 24 | disciplinary action, whether it was termination or |
| 25 | suspension or whatever the case might be. |

```
 1      Q:  Any other reasons that you could -- that you
 2  can think of, as to why someone might be terminated
 3  from their employment at AT&T?
 4      A:  Moonlighting, working for somebody else
 5  while you were utilizing proprietary company
 6  information.  You know, working with the competitor
 7  in some way, shape or form, in a surreptitious
 8  fashion, but again, those are violations, again, of
 9  the code of conduct in the broadest terms.  You
10  know, the code of conduct was a broad guideline for
11  the kinds of activities that would get you, you
12  know, dismissed.  Messing around with the company
13  employees, sexual harassment, stealing, violation of
14  secrecy of communications act.  Those kinds of
15  things were the grounds.
16      Q:  You have given me a number of grounds, and
17  I'm just going to ask you again, until we exhaust
18  your recollection.
19      A:  Sure.
20      Q:  Are there any other bases that you can think
21  of?
22      A:  I have mentioned performance, and you know,
23  that's about it.
24      Q:  And whose responsibility was it to determine
25  whether a particular employee was a poor performer?
```

```
 1        A:   The manager's prerogative.
 2        Q:   Would a reduction in force be another reason
 3   why somebody might be terminated from their
 4   employment?
 5        A:   I assume.
 6        Q:   Did you ever have occasion during your
 7   tenure at AT&T to see that any reductions in force
 8   happened?
 9        A:   I have seen reductions in force happen.  I
10   have never been part or parcel to any of them, to my
11   knowledge.
12        Q:   Okay.
13        A:   I have experienced the inability to
14   backfill, things of that nature, when there was some
15   force programs in effect, but I have not had to
16   personally let somebody go because of a forced
17   management issue.
18        Q:   How about personality conflicts?
19        A:   If those existed, you did what you could to,
20   you know, do some reassigning.
21        Q:   And what if -- What if the personality
22   conflict were a continuing problem?
23        A:   I have no firsthand knowledge of that.
24        Q:   Okay.  So it may or may not be a basis for
25   termination, you just don't know?
```

1     A:   Yes.
2     Q:   Did you personally, sir, and I'm just asking
3  about you --
4     A:   Uh-huh.
5     Q:   -- did you personally ever tell Mr. Felekey
6  that he could only be terminated for cause?
7     A:   I don't want to say that I used those exact
8  words, you know.  I think that we -- we had an
9  annual review of the code of conduct, and as a
10 result of that annual review of the code of conduct,
11 which was a requirement back in the predivestiture
12 days of AT&T.
13 Every employee had to sign that they had
14 been reviewed as to what was expected of them, and
15 that sort of implied those kinds of things.  So I
16 don't know that I have answered your question, but
17 we did an annual review and we covered the various
18 kinds of things that would result in termination.
19    Q:   Okay.  And did you ever tell him, though,
20 that the company -- that he could only be terminated
21 for cause?
22    A:   No, I don't know that I ever used those
23 words.  I don't think I would have been -- I would
24 have no reason to.
25    Q:   Did you ever personally hear anybody else

1  tell Mr. Felekey that he could only be terminated
2  for cause?  Did you overhear somebody else tell him
3  that?
4       A:  No.
5       Q:  If I could direct your attention to the
6  second page of your affidavit, sir.
7       A:  Sure.
8       Q:  Paragraph 8, and I just want you to tell me
9  if I have read this correctly.  It says each year
10 every employee would go through a rigorous appraisal
11 process.
12      A:  Uh-huh.
13      Q:  Each employee's performance was analyzed and
14 decisions were made for rewards, such as promotions,
15 annual salary increases, and bonuses.  Did I read
16 that correctly?
17      A:  Yes, you did.
18      Q:  Is that part of the annual review you were
19 referencing before?
20      A:  No.
21      Q:  Okay.
22      A:  The annual review that I referenced before
23 was specific to the code of conduct.
24      Q:  Okay.
25      A:  That was something totally separate.  That