LEXSEE 2001 U.S. DIST. LEXIS 519

**TY SCHERMERHORN, Plaintiff, -against- MOBIL CHEMICAL COMPANY, A DIVISION OF MOBIL OIL CORP., Defendant.**

3:99 CV 941 (GLG)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2001 U.S. Dist. LEXIS 519

January 17, 2001, Decided

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment (Doc. No. 22) GRANTED.

**COUNSEL:** For TY SCHERMERHORN, plaintiff: George F. Martelon, Jr., Lynch, Trembicki, Martelon & Boynton, Milford, CT.

For MOBIL CHEMICAL CO, INC, defendant: Gary S. Starr, Shipman & Goodwin, Hartford, CT.

**JUDGES:** GERARD L. GOETTEL, United States District Judge.

**OPINIONBY:** GERARD L. GOETTEL

**OPINION:**

Following the Connecticut Supreme Court's decision in *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 662 A.2d 89 (1994), the courts in Connecticut (both State and federal) have seen an increasing number of wrongful discharge cases in which a former, at-will employee attempts to assert a breach of contract claim based upon oral remarks made to him at the time of his hiring and/or provisions in the employer's handbook. This is another of such cases.

Plaintiff, Ty Schermerhorn, a nine-year employee of defendant Mobil Chemical Corporation, has brought this state-law breach of contract action against his former employer, alleging that his termination was in violation of representations made to him by the company during the hiring process, terms of an employee handbook providing for progressive discipline, and [*2] the employer's routine disciplinary procedures. Our jurisdiction is invoked pursuant to the federal diversity statute, *28 U.S.C. § 1332*. Defendant has now moved for summary judgment **(Doc. # 22)**. For the reasons set forth below, defendant's motion is granted.

**BACKGROUND**

The following facts, which are set forth in defendant's Rule 9(c)1 Statement of Undisputed Facts, are accepted by the Court as true, since no opposing statement has been filed by plaintiff. See D. Conn. L. Civ. R. 9(c)1 and 9(c)2.

On June 28, 1989, defendant hired plaintiff to work at its Stratford, Connecticut, facility which produces polypropylene film that is used as a flexible packaging material. At the time he was hired, plaintiff was not given a contract of employment, he was not told how long he would be employed nor what the procedures would be if he were terminated. There was no employee handbook in effect at the time of his hire. n1

---

n1 Plaintiff claims that he was given an employee handbook at the time he interviewed with Mobil and that he kept this handbook during his entire employment with Mobil. (Pl.'s Aff. P 7.) He states that it provided for progressive discipline steps in the event that there was a violation of the rules. Id. Plaintiff has not produced a copy of this handbook. Moreover, in his deposition, plaintiff testified that he received a handbook "after [he was] employed," although he "can't say for sure" exactly when he received it. (Pl.'s Dep. at 12)(emphasis added). Defendant maintains that the only employee handbook ever provided to plaintiff was the one he received some six months after he commenced his employment and which has been produced for the Court. Indeed, plaintiff identified this Handbook as the one he received. (Pl.'s Dep. at 17.) The Employee Handbook clearly bears a date of "1/90" on the bottom of each page.

[*3]

Case 3:02-cv-00691-CFD    Document 71-5    Filed 01/04/2006    Page 2 of 7

Page 2
2001 U.S. Dist. LEXIS 519, *

Approximately six months later, defendant issued its Employee Handbook ("Handbook"), which included the following statement:

> Mobil does not intend this handbook, whether received before or after you begin your employment, or whether interpreted explicitly or by implication, to constitute a contract for employment or a part of any offer of employment.

(Mobil Chemical Employee Handbook at 1.2.) Likewise, at page v, the Handbook provided that "this handbook is not intended to create a contract of employment." When asked at his deposition if he saw this disclaimer when he received the Handbook, plaintiff replied "possibly." (Pl.'s Dep. at 20.)

Included in the Handbook was a section entitled "Standards of Conduct," which listed specific prohibited acts of misconduct, including use of foul or abusive language to fellow employees, insubordination or disobedience to proper authority, and the making of obscene remarks. (Handbook at 6.1.) The Handbook contained a guideline for corrective action procedures but stated that "the circumstances or facts surrounding particular instances of misconduct may warrant deviation from the general disciplinary guidelines," and that the Company [*4] "reserves the right to by-pass all or some steps outlined in the procedure below or, at its discretion, issue more or less sever [sic] discipline after consideration of the particular incident." (Handbook at 6.3.)

When the Handbook was issued, a copy was given to plaintiff, who was then responsible for reading the policies and procedures and knowing them, which plaintiff testified that he did. (Pl.'s Dep. at 25.) Plaintiff admits that he was also aware that the Company had the right to by-pass all or some of the steps in the guidelines or not to follow them at all. *Id. at 47.*

Although plaintiff was generally rated as a satisfactory employee, he had several run-ins with other employees. The first occurred in January, 1995. Plaintiff was written up over an incident involving another employee and a bottle of soda. (The background of this incident has not been provided to the Court.) In January 1997, plaintiff was involved in a verbal confrontation with his Team Coordinator, in which plaintiff used abusive and obscene language directed at the Team Coordinator. A meeting was held between plaintiff and various supervisors, at which plaintiff admitted the verbal abuse [*5] but complained about the treatment he had been receiving from the Coordinator. A written warning was issued to plaintiff for use of abusive language, which plaintiff refused to sign. The warning specifically stated that "continuation of such behavior in the future will result in further corrective action, up to and including termination."

In plaintiff's 1996 performance review, which he signed on April 2, 1997, it was noted that his personal conduct had been unacceptable. In all other areas, plaintiff received ratings of "acceptable" or "outstanding." This review was discussed with plaintiff before he signed it.

On April 28, 1997, plaintiff was involved in another incident in which he used vulgar and obscene language directed at a female employee. This incident was overheard by another female employee. The two female employees reported this behavior to their superiors. They gave written statements as to what had occurred and were interviewed separately by supervisory personnel. A meeting was then held with plaintiff to get his side of the story. He was told of the allegations that had been made and was shown the statements. He denied that any incident of any sort had occurred. Company [*6] officials then consulted with the Human Resources Director, the Plant Manager, and legal counsel as to what action should be taken. They determined that there was no reason not to credit the statements of the two female employees who had no motive for improperly accusing plaintiff and who had good work records. After further consideration by Company officials, plaintiff was advised that his employment was being terminated.

As noted earlier, plaintiff did not file a Rule 9(c)2 statement. He did, however, file an affidavit in opposition to the motion devoted mainly to the oral "promises" he claims were made to him at the time of his employment. He states that the individuals in the Personnel Department who interviewed him had known his father who had worked for the company for many years and was then retired. He states that one of them

> indicated to me that based on my father's reputation with the company, his years of service and hard work, that if I performed in the same fashion that I would probably be able to retire from Mobil with many years of service.

(Pl.'s Aff. at P 3.) He also states that other personnel employees told him "that Mobil wanted me as an employee, [*7] that my job prospects at Mobil were excellent and that I could expect a long tenure at Mobil." *Id. at P 5.*

On a motion for summary judgment we accept these statements as true. Indeed, it seems likely that members

Case 3:02-cv-00691-CFD    Document 71-5    Filed 01/04/2006    Page 3 of 7

Page 3
2001 U.S. Dist. LEXIS 519, *

of the Personnel Department would have made such statements at the time plaintiff was hired, particularly in light of his father's employment with the Company. During his deposition, however, plaintiff made no claim that anyone told him that he could be fired only for good cause, nor was he told anything specific about how long he would work for Mobil, nor were any portions of any employee handbook read to him or cited to him at the time he was hired.

Plaintiff contends that, during his initial contacts with Mobil, he was given an employee handbook, which he kept during his entire employment at Mobil. Plaintiff has not produced a copy of any other evidence of such a handbook, and the evidence is clear that the Employee Handbook discussed above was not prepared or distributed to plaintiff until some months after he was hired. The pertinence of the employee handbook is plaintiff's understanding that it provided for "progressive discipline steps," id. at P 7, [*8] and that

> if I were to break any of the rules of conduct of Mobil for inappropriate communication, I should have been counseled by my supervisor, given a written warning or suspended before I was terminated.

Id. at P 13. As noted above, however, the Company claims that these procedures were followed.

In plaintiff's deposition, he acknowledges using profanity to a supervisor in January 1997 and having met with management concerning his behavior at that time and after the April 1997 incident. He does claim, however, that these management criticisms were not "discipline" but were only "notes to the file." Defendant responds that a note to the file and a written warning are interchangeable terms and that plaintiff was in fact given one written warning that he refused to sign. However, we do not base this decision on that claim.

As for the incident with the female employee that triggered plaintiff's termination, he simply states,

> To the best of my recollection and belief, I did not make any inappropriate statements to Maria Pinto on the day in question. I have no recollection of seeing her on that date or having a verbal conversation with her whatsoever. [*9]

(Id. at P 14.) The comparative truth of the statements made by the female employees and the position taken by plaintiff are also not an issue in resolving this motion. Rather, the threshold issue is whether plaintiff had a contract, either express or implied, which defendant violated in terminating him or in the steps that it took in the termination process, for if plaintiff were an employee at-will, defendant could terminate him for any reason at all (or no reason) providing that its actions did not violate public policy. n2

> n2 Investigation of complaints of sexual harassment are not contrary to public policy. Indeed, the employer has a duty to investigate and take appropriate corrective action in order to avoid Title VII liability. Its obligations do not cease because the alleged harasser denies inappropriate conduct. See Malik v. Carrier Corp., 202 F.3d 97, 105-106 (2d Cir. 2000).

## DISCUSSION

Historically, employment relationships in the United States have [*10] been governed by the common-law doctrine of employment at will. Under this traditional rule, in the absence of an explicit contract, either party could unilaterally terminate the employment relationship at any time, with or without cause. n3 However, the passage of numerous federal and State employment discrimination statutes outlawing discrimination based on race, age, sex, ethnicity, religion, etc., has provided a vehicle for employees, who are otherwise "at will," to contest the propriety of their employment termination. n4 Additionally, over the past several decades, the courts have eroded the employment-at-will doctrine based upon theories of implied contract, public policy, and the covenant of good faith and fair dealing. n5

> n3 See Christopher L. Pennington, The Public Policy Exception to the Employment-At-Will Doctrine: Its Inconsistencies in Application, 69 Tulane L. Rev. 1583, 1584 (1994).
>
> n4 Having presided at numerous employment discrimination trials, I can say that the issue of whether the employer's actions were improperly discriminatory is usually subsumed in the jury's concern for whether the employer treated the employee properly and fairly. If the jurors do not agree with the employer's action (and they often do not since most jurors have been employees), they often find that the employer's actions resulted from whatever form of discrimination is claimed.

[*11]

n5 See Thomas J. Miles, Common Law Exceptions to Employment At Will and U.S. Labor Markets, 16 J.L. Econ. & Org. 74, 77 (2000).

In the instant case, plaintiff has based his wrongful discharge claim on a state-law theory of breach of an implied contract of employment based upon representations allegedly made to him during the hiring process, provisions of an employee handbook regarding progressive discipline, and the employer's customary disciplinary practices. Although the "default rule of employment at will" n6 can be modified by an agreement of the parties, to prevail on such a claim, a plaintiff must prove that the employer had agreed, either by words or action or conduct, to undertake some form of actual contractual commitment under which the employee could not be terminated without just cause. An implied contract, like an express contract, depends on an actual agreement between the parties. *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 211 n.2, 520 A.2d 217 (1987). Accordingly, to survive a motion for summary judgment, a plaintiff [*12] has the burden of presenting evidence that the defendant had agreed to some form of contractual commitment, either by words or action or conduct. *Reynolds v. Chrysler First Commercial Corp.*, 40 Conn. App. 725, 729-30, 673 A.2d 573, cert. denied, 237 Conn. 913, 675 A.2d 885 (1996); *Burnham v. Karl and Gelb, P.C.*, 50 Conn. App. 385, 388, 717 A.2d 811, aff'd, 252 Conn. 153, 745 A.2d 178 (2000). In this case, plaintiff must show that defendant agreed not to discharge him except for cause and only after plaintiff had an opportunity to rebut the complaints against him, i.e., after notice. See also *Johnson v. Chesebrough-Pond's USA, Inc.*, 918 F. Supp. 543 (D. Conn.), aff'd, 104 F.3d 355, 1996 WL 734043 (2d Cir. 1996)(unpublished opinion).

n6 *Torosyan*, 234 Conn. at 15.

Plaintiff asserts that his case is "directly parallel" to the Torosyan case, in which the Connecticut Supreme Court found an [*13] implied contract of employment between the parties that could not be terminated, except for good cause. The Torosyan Court held that

all employer-employee relationships not governed by express contracts involve some type of implied "contract" of employment. "There cannot be any serious dispute that there is a bargain of some kind; otherwise, the employee would not be working." 1 H. Perritt, Employee Dismissal Law and Practice (3d Ed. 1992) § 4.32, p. 326. To determine the contents of any particular implied contract of employment, the factual circumstances of the parties' relationship must be examined in light of legal rules governing unilateral contracts.

*234 Conn. at 13;* see also *Gaudio v. Griffin Health Services Corp.*, 249 Conn. 523, 532, 733 A.2d 197 (1999).

Torosyan is one of those difficult cases which, we are told, makes bad law. The plaintiff had been employed in California as a chemist and came to Connecticut at the defendant's invitation and expense for job interviews. At several of the interviews he informed defendant's employees that he was seeking long-term job employment and did not want to move his family from California [*14] unless the defendant could guarantee him job security. *234 Conn. at 7.* The interviewers told the plaintiff that if he did a good job the defendant would "take care" of him and that they hoped he would stay forever. Id. Moreover, they offered the plaintiff the opportunity to examine the company's employee manual to determine whether it provided the guarantees that he sought. The defendant subsequently wrote a letter confirming an offer of employment at a specific salary and with various fringe benefits but it did not state that the plaintiff's employment would be terminable only for cause or that it contained all of the terms of plaintiff's employment contract or superseded any prior or oral representations. *Id. at 8.* The plaintiff countersigned the letter and returned it to the defendant. *Id. at 9.*

On the day that the plaintiff reported to work he was given a copy of the employee manual which he immediately proceeded to read. It contained provisions concerning "discharge for cause" and various "open door" procedures for resolving job-related problems. The provisions in the manual were material to the plaintiff's decision to continue [*15] to work for the defendant. Id. The trial court determined that the foregoing constituted an implied contract providing that the plaintiff could be terminated only for cause. *Id. at 10.* The Connecticut Supreme Court found that this factual finding was not clearly erroneous, taking into account the transcontinental relocation of the plaintiff and his family and the provisions of the employee manual setting forth the terms and conditions of his employment. *Id. at 16-17.* It further found that the subsequent issuance of a new employee manual, containing terms that would have sub-

Case 3:02-cv-00691-CFD    Document 71-5    Filed 01/04/2006    Page 5 of 7

Page 5
2001 U.S. Dist. LEXIS 519, *

stantially interfered with the plaintiff's legitimate expectations concerning his employment, did not alter the plaintiff's existing implied contract, because there was no evidence that the plaintiff had consented to these new terms. *Id. at 19-20.*

Contrary to plaintiff's urgings, we find the facts of the instant case distinguishable from those in Torosyan. The remarks that were made to plaintiff by members of the Personnel Department, who had known plaintiff's father for many years, did not constitute a clear and definite promise that plaintiff could be [*16] terminated only for cause or only in a certain manner. Indeed, there was no discussion at all about how termination of employment could occur. Mrs. Kealey, an Assistant in the Personnel Department, merely stated that "if [plaintiff] performed in the same fashion [as his father had], that [he] would probably be able to retire from Mobil with many years of service." (Pl.'s Aff. at P 3.) Mr. Naclero, also in Personnel, and Mr. Bradshaw, plaintiff's first supervisor, "reinforced for [plaintiff] the idea that Mobil wanted [him] as an employee, that [his] job prospects at Mobil were excellent and that [he] could expect a long tenure at Mobil." *Id. at P 5.* There is nothing in these remarks that could be construed as an expression of intent to establish the terms of plaintiff's employment, or that termination would only be for just cause, or that there would be a definite procedure followed before plaintiff could be terminated. Plaintiff's situation is far different from that of Mr. Torosyan, who specifically asked for assurances of job security before agreeing to a trans-continental move for his family, and who was referred to an employee manual that discussed [*17] discharges "for cause" and the company's "open door" policy for resolving employee disputes. These representations were material to Mr. Torosyan's decision to accept the offer of employment. n7

---

n7 See also *Coelho v. Posi-Seal International, Inc.*, 208 Conn. 106, 113-14, 544 A.2d 170 (1988), in which the Connecticut Supreme Court upheld a trial court's refusal to set aside a jury's finding of an implied agreement that the plaintiff would not be terminated from his employment as a result of conflicts between his department and another department at the company. The Court summarized the evidence as follows:

> In summary, the plaintiff testified that during the job interview he had expressed strong reservations to Miller [President of Posi-Seal] about accepting the position as manager of quality control because he believed that there was an inherent conflict between the quality goals and the cost concerns of manufacturing; that he had been aware that the previous manager of quality control had recently left Posi-Seal; that he had sought assurances that he would be backed up by Miller, if a conflict developed between the quality control and manufacturing departments, and a guarantee that he would not be terminated as a result of such a conflict; and that Miller on several occasions, both before and after the plaintiff commenced employment at Posi-Seal, had indicated that Posi-Seal would support the quality department and would not terminate the plaintiff as a result of conflicts between the quality control and manufacturing departments.

Plaintiff in the instant case argues that Coelho buttresses his position that an implied contract was created during the interview process. However, we view the facts in Coelho as far more favorable to Mr. Coelho than the facts in the instant case. Numerous specific representations had been made to Mr. Coelho by the president of the company in response to his request for assurances that he could not be terminated because of conflicts between his department and another. Those facts are not present here. Further, it is significant that the Court in Coelho did not go so far as to find an implied contract that the plaintiff could not be terminated except for just cause under all circumstances. *208 Conn. at 113.*

[*18]

As the Court stated in Torosyan, in order to find that an implied contract of employment incorporates specific representations made orally by the employer, the plaintiff must prove that the these oral representations were an "'offer' -- i.e., that it was a promise to the employee that, if the employee worked for the company, his or her employment would thereafter be governed by those oral . . . statements. . . ." *234 Conn. at 13-14.* "In order to support contractual liability, the defendants' representations must be sufficiently definite to manifest a 'present intention on the part of the defendants to undertake immediate contractual obligations to the plaintiff.'" *Burnham, 50 Conn.*

Case 3:02-cv-00691-CFD    Document 71-5    Filed 01/04/2006    Page 6 of 7

Page 6
2001 U.S. Dist. LEXIS 519, *

*App.* at 389 (quoting *D'Ulisse-Cupo, 202 Conn.* at 214-15). Plaintiff has presented no facts from which a reasonable trier of fact could conclude that defendant, by virtue of these statements of its employees, intended to make plaintiff an offer of employment whereby plaintiff could only be terminated for cause. See also *Barbuto v. William Backus Hospital, 1995 Conn. Super. LEXIS 1184, No. 105452, 1995 WL 235068,* *4 (Conn. Super. Apr. 13, 1995)*(holding that the defendant's [*19] representations that an employee's position would never be taken away and that she could have her position for as long as she wanted it were insufficient to establish an immediate intention by defendant to undertake a contractual commitment toward the plaintiff). The Court finds that these statement were completely inadequate to establish an oral contract, without even considering Statute of Frauds implications.

Plaintiff also relies on the terms of an employee handbook given to him "during his initial contact with Mobil," which "provided for progressive discipline steps in the event that there was any violation of the rules." (Pl.'s Aff. at P 7.) As plaintiff asserts, it is firmly established under Connecticut law that statements in an employer's personnel manual may "under appropriate circumstances" give rise to an express or implied contract between the employer and employee. *Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 564, 479 A.2d 781 (1984).* As noted above, other than this one statement by plaintiff in his affidavit, (which is contradicted by his deposition testimony), there is no evidence of any handbook other than the one that was distributed six months [*20] after plaintiff commenced his employment with Mobil, and on which plaintiff expressly does not rely in support of his breach of contract claim. In any event, because plaintiff was not given this Employee Handbook until well after he had commenced his employment, he could not have relied on any of its terms in deciding whether to accept the position. See *Torosyan, 234 Conn.* at 18-20.

Moreover, the Connecticut Supreme Court has stated "with unambiguous clarity" that "employers can protect themselves against employee contract claims based on statements made in personnel manuals by following either (or both) of two simple procedures: (1) eschewing language that could reasonably be construed as a basis for a contractual promise; and/or (2) including appropriate disclaimers of the intention to contract. . . ." *Gaudio, 249 Conn.* at 535 (internal citations and quotations omitted). Numerous Connecticut state court decisions have held that contract claims based upon the terms of an employee handbook must fail if the handbook contained an effective disclaimer. See, e.g., *Marfiak v. Blue Cross and Blue Shield of Connecticut, Inc., 1997 Conn. Super. LEXIS 2997, No. CV 940368007S, 1997 WL 724514* [*21] *(Conn. Super. Nov. 3, 1997); Schain v. Blue Cross Blue Shield of Connecticut, Inc., 1996 Conn. Super. LEXIS 2762, No. CV 930349216, 1996 WL 634826 (Conn. Super. Oct. 21, 1996).* The disclaimer in Mobil's Handbook is clear and unequivocal and, although not labeled "disclaimer," it was sufficiently obvious as to be readily observable to any employee reviewing the Handbook. See *Smith v. Shoreline Care Ltd., 1996 Conn. Super. LEXIS 1343, No. 360206, 1996 WL 365015 (Conn. Super. May 17, 1996).* No contract, express or implied, was created by the Handbook.

Plaintiff also asserts that an implied contract arose by virtue of defendant's usual and customary practice of using progressive discipline procedures with other employees before termination. The Connecticut Court of Appeals rejected a similar claim in *Reynolds v. Chrysler First Commercial Corp., 40 Conn. App. 725, 673 A.2d 573.* In that case, the plaintiff argued that the defendant's routine and customary use of the same progressive disciplinary procedures imparted an understanding to its employees that those procedures would always be used, and that this understanding was sufficient to create a "meeting of the minds" for purposes of creating an [*22] implied contract. The court rejected plaintiff's argument, stating "contracts are not created by evidence of customs and usage." *Id.* at 732 (internal citations and quotations omitted). n8 "The plaintiff's belief that he had an employment contract with the defendant, without more, is insufficient to sustain an implied contract claim." Id Finding that there was a lack of factual predicate supporting the plaintiff's feelings and beliefs that an implied contract existed, the court upheld the granting of summary judgment in favor of the employer. *Id.* at 733.

  n8 The court noted further that the defendant's disciplinary policies were documented in its employee manual, which the plaintiff had expressly rejected as the basis for his claim. *40 Conn. App.* at 733. Similarly, in this case, plaintiff has specifically rejected the Handbook as the basis for his breach of contract claim. Although the Handbook provides for progressive discipline, as noted above, it clearly grants the employer the discretion and right to depart from these procedures (as well as disclaiming any intent to create a contract between the parties).

[*23]

CONCLUSION

From the foregoing, we conclude that there was no implied contract of employment whereby plaintiff would only be terminated for cause nor were there any requirements concerning the manner in which an at-will em-

ployee could be terminated. Consequently, Defendant's Motion for Summary Judgment **(Doc. No. 22)** is **GRANTED**. The Clerk will enter judgment for the defendant.

Dated: January 17, 2001

Waterbury, Connecticut.

/s/

GERARD L. GOETTEL

United States District Judge