LEXSEE 2003 U.S. DIST. LEXIS 7056


Positive
As of: Aug 02, 2007

ALBERT HANNA, Plaintiff, v. INFOTECH CONTRACT SERVICES, INC., and PFIZER, INC., Defendants.

No. 3:01 CV 680 (SRU)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

2003 U.S. Dist. LEXIS 7056; 91 Fair Empl. Prac. Cas. (BNA) 1459

April 21, 2003, Filed

**SUBSEQUENT HISTORY:** Affirmed by Hanna v. Infotech Contract Servs., 2004 U.S. App. LEXIS 4692 (2d Cir. Conn., Mar. 11, 2004)

**DISPOSITION:** Defendants' motion for summary judgment granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee filed suit against defendant former employer alleging discrimination under *42 U.S.C.S. § 2000e et seq.*, and *Conn. Gen. Stat. § 46a-60 et seq.*; breach of contract and of the covenant of good faith and fair dealing; defamation; and negligent infliction of emotional distress (NIED). He also alleged similar claims against defendant, the employer's client for which the employee worked. Defendants moved for summary judgment.

**OVERVIEW:** The employee alleged that he was fired and forced to endure a hostile work environment on account of his national origin or ethnicity, on account of false allegations relating to sex and his gender, and in retaliation for complaining about being discriminated against. Although the employee produced sufficient evidence to establish a prima facie case of discrimination, defendants rebutted his prima facie case by establishing that he was terminated due to multiple allegations that he harassed female employees of the client and the employee failed to show the reason was pretextual. He also provided no evidence that he was discriminated against on account of his gender or retaliated against for having attempted to make use of dispute resolution mechanisms. The employee's breach of contract claims failed as the contract was terminable-at-will and his termination did not violate public policy. As the employee was not terminated in bad faith, his violation of the covenant of good faith and fair dealing claim failed. The allegedly defamatory statements made by defendants were privileged and the employee did not allege that defendants took any actions that gave rise to a NIED claim.

**OUTCOME:** Defendants' motions for summary judgment were granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A fact is "material" if it might affect the outcome of the suit under the governing law, under the applicable substantive law. An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Thus, if reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate.

Case 3:02-cv-00691-CFD    Document 127-9    Filed 08/03/2007    Page 2 of 10

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

Page 2

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Evidence > Inferences & Presumptions > General Overview*
[HN2] When ruling on a summary judgment motion, the court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. The court may not weigh the evidence, even when the court believes such evidence is implausible. Ultimately, credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN3] The moving party for summary judgment bears the initial burden of showing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. However, the movant need not prove an absence of a genuine issue of material fact where the nonmoving party bears the burden of proof. In such circumstances, the burden on the moving party may be discharged by "showing" --that is, pointing out to the district court -- that there is an absence of evidence to support the non-moving party's case.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > Appropriateness*
*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*
[HN4] If the movant for summary judgment has met the initial burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. The nonmoving party may not rest upon the mere allegations or denials of the pleadings, but rather must present sufficient probative evidence from which a rational trier of fact could find for the nonmovant. If the nonmovant fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, summary judgment is appropriate. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Coverage & Definitions > General Overview*
*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > Discharges & Failures to Hire*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > Coverage & Definitions > Employers*
[HN5] *42 U.S.C.S. § 2000e(a)* prohibits employers from discharging an employee because of his or her race, color, religion, sex, or national origin. *Conn. Gen. Stat. § 46a-60(a)(1)* similarly prohibits employers from firing an employee because of his or her race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability. *Section 46a-60( a)(4)* prohibits firing an employee for filing a complaint about discriminatory practices while *§ 46a-60(a)(8)* prohibits sexual harassment, either by the employer or the employer's agent.

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*
*Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting*
[HN6] Under the McDonnell Douglas framework, the plaintiff must first establish a prima facie case under Title VII of the Civil Rights Act of 1964, requiring a plaintiff to show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) despite these qualifications, he was discharged; and (4) his position remained open and was ultimately filled by an employee not in his protected class. Alternatively, a plaintiff may satisfy the fourth element by establishing that the decision occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. A plaintiff's burden to establish a prima facie case of discrimination is de minimis. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, non-discriminatory business rationale for its actions. If the employer articulates such a reason, the plaintiff has the burden of proving that the proffered reason was a pretext for discrimination.

*Contracts Law > Performance > Discharges & Terminations*

Case 3:02-cv-00691-CFD   Document 127-9   Filed 08/03/2007   Page 3 of 10

Page 3
2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > Public Policy*
[HN7] The general rule under Massachusetts law is that an employment-at-will contract can be terminated at any time for any reason or for no reason at all. The exception to the rule is that employees in certain circumstances can seek redress for terminations in violation of public policy. The employee can seek redress for public policy violations if the employee was fired for asserting a legally guaranteed right (e. g., filing workers' compensation claim), for doing what the law requires (e. g., serving on a jury), or for refusing to do what the law forbids (e. g., committing perjury).

*Contracts Law > Performance > Discharges & Terminations*
*Contracts Law > Types of Contracts > Covenants*
*Labor & Employment Law > Employment Relationships > At-Will Employment > General Overview*
[HN8] The Massachusetts Supreme Judicial Court has held that a "bad faith" termination constitutes a breach of an at-will employment contract.

*Torts > Business Torts > Commercial Interference > Contracts > Elements*
*Torts > Procedure > Commencement & Prosecution > General Overview*
[HN9] The Connecticut Supreme Court has made clear that not all conduct that disrupts a contract constitutes tortious interference. For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation or that the defendant acted maliciously. In Connecticut, the burden of establishing an improper purpose is on the plaintiff.

*Torts > Intentional Torts > Defamation > General Overview*
[HN10] To prove that the defendants are liable for defamation, a plaintiff must establish that the defendants published false statements that harmed him, and that the defendants were not privileged to do so.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*
[HN11] It is for a court to determine, as a matter of law, whether a defendant made defamatory statements while acting on an occasion of privilege.

*Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Employment Practices > Discharges & Failures to Hire*
*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*
[HN12] In Connecticut in the context of a defamation claim, statements made within each corporation, either to protect against sexual harassment or to review and terminate a plaintiff's employment are privileged.

*Torts > Intentional Torts > Defamation > Defenses > Privileges > Qualified Privileges*
[HN13] Under Connecticut law, a conditional or qualified privilege may be abused or lost if the defendant published or broadcast the defamatory remarks with malice, improper motive, or bad faith.

*Labor & Employment Law > Wrongful Termination > General Overview*
*Torts > Negligence > Actions > Negligent Infliction of Emotional Distress > Elements*
*Torts > Negligence > Causation > General Overview*
[HN14] In Connecticut, to prove a claim of negligent infliction of emotional distress, a plaintiff must establish that a defendant knew or should have known that its conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily injury. Conduct giving rise to a claim for negligent infliction of emotional distress must occur in the termination process. Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process. However, the mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior, and therefore is not enough, by itself, to sustain a claim for negligent termination of employment. In cases where the employee has been terminated, a finding of a wrongful termination is neither a necessary nor a sufficient predicate for a claim of negligent infliction of emotional distress. The dispositive issue in each case is whether the defendant's conduct during the termination process is sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm.

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

COUNSEL: [*1] For Albert A Hanna, PLAINTIFF: Jeffrey M Sklarz, Zeisler & Zeisler, PC, Bridgeport, CT. Thomas G Moukawsher, Moukawsher & Walsh, Hartford, CT.

For Infotech Contract SVCS, Inc, DEFENDANT: David R Schaefer, Rowena Amanda Moffett, Brenner, Saltzman & Wallman, New Haven, CT. Roderick MacLeish, Jr, Annapoorni R Sankaran, Greenberg & Traurig, Boston, MA.

For Pfizer, Inc, DEFENDANT: Mary A Gambardella, Steven J Younes, Epstein, Becker & Green, PC, Stamford, CT. Roderick MacLeish, Jr, Greenberg & Traurig, Boston, MA.

JUDGES: Stefan R. Underhill, United States District Judge.

OPINION BY: Stefan R. Underhill

OPINION

### RULING ON MOTIONS FOR SUMMARY JUDGMENT

This case arises from the termination of Plaintiff Albert A. Hanna from his position with Defendant InfoTech Contract Services, Inc. ("InfoTech"). Hanna filed suit against InfoTech alleging discrimination under *42 U.S.C. § 2000e et seq.* and *Conn. Gen. Stat. § 46a-60 et seq.*; breach of contract; breach of the covenant of good faith and fair dealing; defamation; and negligent infliction of emotional distress. Hanna also filed suit against InfoTech's client, Pfizer, Inc. ("Pfizer"), alleging discrimination; [*2] tortious interference with contract rights or financial expectancies; defamation; and negligent infliction of emotional distress. InfoTech and Pfizer filed motions for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure* on all counts (Dkt. Nos. 41, 47). For the following reasons, InfoTech and Pfizer's motions for summary judgment are GRANTED.

### FACTS

Hanna is a United States citizen who was born in Egypt. He is of Arab ethnic background. InfoTech is a technology consulting firm that provides computer support personnel for its clients. Pfizer hired InfoTech to provide long term information technology consultants to work at the Pfizer campus in Groton, Connecticut. On May 18, 1998, Hanna signed a contract (the "1998 agreement") with Winter, Wyman Contract Services, Inc. ("Winter Wyman"), InfoTech's predecessor in interest, to provide computer support services for Pfizer. The parties "approximated" the term of the contract to be three months. *Id.* at 1. After three months, "employment shall automatically be extended for successive one month periods, unless either party gives notice of its intentions to terminate this Agreement ...." *Id.* The 1998 agreement [*3] was terminable at will by Winter Wyman, *Id.* at 2, a fact that Hanna understood when he signed the 1998 agreement. (Hanna Dep. at 33-36.) The parties agreed that the 1998 agreement "shall be construed under the laws of the State of Massachusetts and any action brought as a result of the breach of this contract shall be brought only in a court sitting entirely within the State of Massachusetts and Employee hereby consents to the jurisdiction thereof." *Id.* In December 1999, Hanna and InfoTech agreed to an extension of "the agreement made on December 20, 1999, between Albert Hanna, and InfoTech Contract Services, Inc., for work performed at Pfizer," until December 30, 2000 (the "1999 extension agreement"). [1] The 1999 extension agreement provides that "all other terms and conditions of the agreement stated above remain in effect." *Id.*

 1 Although the 1999 extension agreement purports to extend a "December 20, 1999" contract, the intention of the parties appears to have been to extend the 1998 agreement. December 20, 1999 is apparently the date of the extension.

[*4] From July 1998 to February 2000, Hanna worked in "managed desktop support," providing computer services to Pfizer. (Hanna Dep. at 40.) Steven Price was in charge of the managed desktop support team to which Hanna was assigned. *Id.* at 41. Lee Torres and KC Davis were also on Price's team. *Id.* at 41.

Hanna's responsibilities consisted of responding to requests by Pfizer employees for assistance with computer problems. Each morning Hanna and other managed desktop support personnel would receive computer support request tickets from a dispatcher. (Hanna Dep. at 40.) They would then visit the person requesting assistance at his or her workstation and attempt to resolve the problem. *Id.* Hanna was assigned to respond to all tickets received from five buildings and three trailers on the Pfizer campus. *Id.* at 42. In early 2000, approximately fifty percent of Hanna's tickets were from one particular building, building 126, largely because that building had many new employees. *Id.* at 43. Because Hanna worked four ten-hour days per week, he often worked until 6:00 or 7:00 p.m. (Hanna Aff. P7.) Because he was not given his own work station, he had to use Pfizer employees' [*5] computers to access his data base queue. *Id.*

Aside from the alleged conduct that would lead to his termination, Hanna had a positive work record at Pfizer. His supervisor, Steven Price, thought Hanna was "a fine technician." (Price Dep. at 42.) Hanna's 1999 evaluation, the only evaluation completed while Hanna

Case 3:02-cv-00691-CFD   Document 127-9   Filed 08/03/2007   Page 5 of 10

Page 5
2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

worked at Pfizer, had mostly positive things to say about his performance. (Pfizer Central Research MDS Technician Performance Commitments for Albert Hanna, Ex. 5 to Mem. in Opp. to Defs. 'Mots. for Summ. J.) The most noteworthy recommendation was that "[a] more outgoing approach to your client base may help you gain even higher satisfaction ratings from your clients." *Id.* at 1.

The grounds for Hanna's claims against InfoTech and Pfizer are largely based on an encounter with Glenda Bryant, a Pfizer administrative assistant. Hanna alleges that, during a service call in the summer of 1999, Bryant inquired into Hanna's national origin and ethnicity. (Hanna Aff. P13.) Hanna claims that, upon hearing that he was of Egyptian origin, Bryant stated that she was not comfortable dealing with Arabs because Arabs are terrorists, and "such people should not be allowed into the [*6] country." *Id.* Hanna alleges that Bryant subsequently told other Pfizer employees that Hanna was a security risk. Bryant denies these claims. Hanna further alleges, and Bryant confirms, that she requested that Hanna not be assigned to her computer service requests.

Shortly after the incident with Bryant, Hanna alleges that he complained to his supervisor, Steven Price. (Hanna Aff. at 4.) Price recalled "Albert telling me that he talked with Glenda Bryant about the Middle East, the conflict in the Middle East that was going on and that I think in the same conversation that Albert told me Lee Torres is going over there." (Price Dep. at 64.) Neither Price nor Hanna was aware why Torres was responding to Bryant's service requests. *(Id.* at 33-35, 65.)

In early February 2000, Pfizer received multiple complaints about Hanna's conduct. On February 1, 2000, Pfizer employee Pamela Close complained to her supervisor, Dr. Jay Stout, that Hanna's behavior toward her made her uncomfortable. (Close Dep. at 43-44; Stout Dep. at 9-17; Turkowski Investigation Notes at 1, Ex. H to the Memo. in Supp. of InfoTech's Mot. for Summ. J. (hereinafter "Turkowski Investigation Notes").) According to [*7] Close, Hanna had repeatedly asked her to dinner, lingered around her after business hours, and became rude when she rebuked his advances. (Close Dep. at 7-17, 33-38; Stout Dep. at 9-17; Turkowski Investigation Notes at 1.) Close complained to Stout after an encounter with Hanna the night before, January 31, 2000, in which Hanna made Close particularly uncomfortable.

Upon receiving this complaint, Stout notified Alison Turkowski of Pfizer's Employee Resources Department. (Stout Dep. at 18; Turkowski Investigation Notes at 1.) Turkowski notified Don McCauley, the Employment Resources representative for Pfizer's Information Technology Department. (Turkowski Investigation Notes at 1.) McCauley contacted Larry Foster, the supervisor of the Pfizer's Information Technology Department. (Foster Investigation Notes at 1, Ex. 12 of Obj. to Defs. 'Mots. for Summ. J. (hereinafter "Foster Investigation Notes"); Turkowski Investigation Notes at 1.) On the basis of this one complaint, Pfizer reassigned Hanna to another building. (Foster Investigation Notes at 1; Hanna Dep. at 68.) Foster contacted Dan Stowe and Jodi Sklar of InfoTech to inform them of the allegations made against Hanna and Pfizer's [*8] decision to reassign Hanna. (Foster Investigation Notes at 1.)

After calling Turkowski, Stout asked Deborah Williams, another Pfizer employee, about Hanna's conduct toward her. (Stout Dep. at 17-18.) The previous week Williams had requested that Stout notify her when he leaves the office in the evening. *Id.* After hearing Close's complaint, Stout became curious about the motivation for Williams' request, and asked Williams whether it was related to Hanna. *Id.* She stated that her request was prompted by Hanna's conduct; Hanna made her feel uncomfortable and had once suggested that she sit on his lap while he worked on her computer. (Stout Dep. at 18.) Stout called Allison Turkowski on or around January 3, 2000 informing her that there were additional Pfizer employees she should speak with. (Turkowski Investigation Notes at 1; Stout Dep. at 18.)

In the evening of February 2, 2000, Glenda Bryant had dinner with Williams and Ann Bader. (Bryant Memo., Ex. 11 at 1 to Mem. in Supp. of Pl. 's Opp. to Defs. 'Mot. for Summ. J.) At that dinner, the Pfizer employees discussed the allegations against Hanna. *Id.*

According to Stout, additional employees came forward to speak with Stout [*9] about Hanna's conduct, including Ellen Olson, Charlene Chomyn, and Glenda Bryant. *Id.* at 18-19, 26. However, Chomyn denies having discussed Hanna's behavior with anyone prior to Hanna's discharge. (Chomyn Dep. at 24.) In these conversations, Stout heard that Jill Russo and Amy Bowman may have had problems with Hanna. (Stout Dep. at 25-26.) These employees appear to have come forward on February 2 and 3, 2000. After discussing their experiences with them, Stout referred each employee to Turkowski, and notified Turkowski and Foster that additional allegations had been made. (Foster Investigation Notes at 1; Turkowski Investigation Notes at 1; Stout Dep. at 19, 24-25.)

One of the employees making a complaint was Glenda Bryant, who apparently spoke with both Stout and Foster in the morning of February 3, 2000. Bryant stated that Hanna offered to buy her flowers. She was sufficiently uncomfortable with Hanna that she requested that Lee Torres address her computer problems rather than Hanna. *Id.* at 24.

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

Page 6

Meanwhile on February 3, 2000, Turkowski interviewed Close, who relayed the same story she had told Stout. (Turkowski Investigation Notes at 1.) Close also stated that many other [*10] employees had the same experiences she did, including "Charlene Chomyn, Debra Williams, Wendy Kneissbates, Glenda Bryant and maybe Jill Russo and Amy Bowman." *Id.* Turkowski stated that she then called Charlene Chomyn, who allegedly stated that she was "very uncomfortable" around Hanna, and that he was "too friendly and asking personal questions." *Id.* As discussed above, Chomyn denies having discussed Hanna's behavior with anyone prior to Hanna's discharge. (Chomyn Dep. at 24.) After speaking with Close and Chomyn, Turkowski called McCauley to relay the what she had found. (Turkowski Investigation Notes at 2.) McCauley indicated at that time that the client had decided to remove Hanna from the assignment with Pfizer. *Id.*

Based on the evidence presented, it appears that Pfizer's decision to remove Hanna from the Pfizer account was made at the suggestion of Larry Foster. (Foster Investigation Notes at 2; Hanna Dep. at 60.) Foster suggested to Diane Whitesell and Don McCauley that Pfizer have Hanna removed from its account. Whitesell and McCauley agreed to have Hanna removed from the account. (Foster Investigation Notes at 2; Hanna Dep. at 60.) Whitesell, McCauley, and Foster [*11] appear to have based this decision on the complaints of Close, Williams, Olson and Bryant. They were also aware that Russo and Bowman may have had problems with Hanna, although it is not clear whether Russo and Bowman had been interviewed at the time the decision was made. Foster then notified Dan Stowe, an InfoTech representative on the Pfizer campus, of Pfizer's decision. Stowe then met with Hanna to inform him of the decision. (Foster Investigation Notes at 2; Hanna Dep. at 60, 68.)

## STANDARD FOR SUMMARY JUDGMENT

[HN1] Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; *see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. A fact is "material" if it "might affect the outcome of the suit under the governing law, under the applicable substantive law." *Anderson, 477 U.S. at 248*. An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998)*. [*12] Thus, if reasonable minds could differ in the interpretation of evidence that is potentially determinative under substantive law, summary judgment is not appropriate. *See R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1995)*.

[HN2] When ruling on a summary judgment motion, the court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson, 477 U.S. at 255* ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)* (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)*); *Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)* (quoting *Diebold, 369 U.S. at 655*); *see also Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 523 (2d Cir. 1992), cert. denied, 506 U.S. 965, 121 L. Ed. 2d 359, 113 S. Ct. 440 (1992)*. [*13] The court may not weigh the evidence, even when the court believes such evidence is implausible. *See Anderson, 447 U.S. at 249*; *R.B. Ventures, 112 F.3d at 58-59*. Ultimately, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions. ..." *Anderson, 447 U.S. at 255*.

[HN3] The moving party bears the initial burden of showing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Langman Fabrics v. Graff Californiawear, 160 F.3d 106, 110 (2d Cir. 1998)*. However, the movant need not prove an absence of a genuine issue of material fact where the nonmoving party bears the burden of proof. In such circumstances, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court --that there is an absence of evidence to support the nonmoving party's case." *Celotex, 477 U.S. at 325*.

[HN4] If the movant has met the initial burden, the burden shifts to the [*14] nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson, 477 U.S. at 250*; *see also Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995)*. The nonmoving party may not rest upon the mere allegations or denials of the pleadings, but rather must present sufficient probative evidence from which a rational trier of fact could find for the nonmovant. *Celotex, 477 U.S. at 327*; *Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995)*.

If the nonmovant fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, summary judgment is appropriate. *Celotex, 477 U.S. at 322*. In such a situation, "there can be no genuine issue as to any material fact,

Case 3:02-cv-00691-CFD   Document 127-9   Filed 08/03/2007   Page 7 of 10

Page 7
2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id. at 322-23* (internal quotation marks and citation omitted).

## DISCUSSION

*Discrimination*

Hanna alleges in count one of his complaint that InfoTech and Pfizer [*15] discriminated against him in violation of *42 U.S.C. § 2000e et seq.* and *Conn. Gen. Stat. § 46a-60(a)(1), (a)(4), and (a)(8)*. [HN5] *Section 2000e(a), Title 42 of the United States Code*, prohibits employers from discharging an employee because of his or her "race, color, religion, sex, or national origin." *Section 46a-60(a)(1)* of the Connecticut General Statutes similarly prohibits employers from firing an employee because of his or her "race, color, religious creed, age, sex, marital status, national origin, ancestry, present or past history of mental disorder, mental retardation, learning disability or physical disability." *Section 46a-60(a)(4)* prohibits firing an employee for filing a complaint about discriminatory practices while *Section 46a-60(a)(8)* prohibits sexual harassment, either by the employer or the employer's agent. Hanna alleges that he was fired and forced to endure a hostile work environment on account of his national origin or ethnicity, on account of false allegations relating to sex and his gender, and in retaliation for complaining about being discriminated against on account of his national origin or ethnicity.

The court analyzes Hanna's [*16] discrimination claims under the burden shifting analysis established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, and its progeny. [HN6] Under this framework, the plaintiff must first establish a prima facie case under Title VII, requiring Hanna to show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) despite these qualifications, he was discharged; and (4) his position remained open and was ultimately filled by an employee not in his protected class. *Kerzer v. Kingly Mfg., 156 F.3d 396, 401 (2d Cir. 1998)*. Alternatively, Hanna may satisfy the fourth element by establishing that the decision occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *Id. at 401*. "A plaintiff's burden to establish a prima facie case of discrimination is de minimis." *Id*. Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, non-discriminatory business rationale for its actions. *Woroski v. Nashua Corp., 31 F.3d 105, 108 (2d Cir. 1994)*. If the employer [*17] articulates such a reason, the plaintiff has the burden of proving that the proffered reason was a pretext for discrimination. *Id*.

Hanna has produced sufficient evidence to establish a prima facie case of discrimination. Defendants allege that Hanna did not satisfactorily perform his duties because he had sexually harassed employees. However, the allegations of sexual harassment are the allegedly pretextual rationale for firing Hanna, and are more appropriately discussed under prongs two and three of the *McDonnell Douglas* test. Hanna did submit a performance review that was largely positive, and his supervisor believed he was "a fine technician." In light of this evidence, the court finds that Hanna has produced sufficient evidence that his performance was satisfactory to make a prima facie case.

Defendants also argue that Hanna has not established that his position remained open and was ultimately filled by an employee not in his protected class. Specifically, defendants argue that "Hanna's duties were absorbed by incumbent employees/contractors, who were working at Pfizer prior to Hanna's discharge." (Mem. in Supp. of InfoTech's Mot. for Summ. J. at 10.) Hanna's supervisor [*18] at Pfizer, Steven Price, stated that he took over Hanna's responsibilities after InfoTech removed him. (Price Dep. at 12-13; Foster Investigation Notes at 1.) The evidence does not indicate whether Price is in a protected class. Hanna alleges that Torres took over his responsibilities. (Hanna Aff. at 5.) Torres agrees that he took over "a lot" of Hanna's responsibilities. (Torres Dep. at 9.) Torres is not in Hanna's protected class. (Hanna Aff. P14.) Although InfoTech did not hire someone to replace Hanna, at least one employee who was not in Hanna's protected class did assume many of his responsibilities. The court concludes that this is sufficient to meet the fourth element of a prima facie case of discrimination.

The Defendants have rebutted Hanna's prima facie case by establishing that Hanna was terminated as a result of multiple allegations that he harassed female employees of Pfizer. Pfizer made the decision to have Hanna removed from its account after receiving sexual harassment complaints from at least four Pfizer employees. Pfizer was additionally aware that at least two other employees were harassed by Hanna. Pfizer documented its investigation and the defendants have provided [*19] ample evidence of the complaints against Hanna.

The burden therefore shifts back to Hanna to prove that discrimination was the real motivation for his termination. Hanna's theory of discrimination in this case is that a non-supervisory employee hatched a conspiracy to fabricate sexual harassment claims against him because of his ethnic background or national origin. The only evidence of bias, prejudice, or racism is Hanna's allegation that Bryant, an administrative assistant, made prejudicial comments about Arabic people. Assuming Hanna's allegation is true and Bryant did make such statements,

Case 3:02-cv-00691-CFD    Document 127-9    Filed 08/03/2007    Page 8 of 10

Page 8

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

this alone would not be sufficient to prove that InfoTech fired Hanna because of his ethnicity or race. Evidence of a single conversation with a non-supervisory employee regarding her beliefs that Arabs are terrorists would not permit a reasonable jury to find that Hanna was fired because of his ethnicity.

Hanna further alleges that because Bryant allegedly does not trust Arabic people, she fabricated her sexual harassment claim against Hanna and, at a dinner on February 2, 2000, convinced two co-workers to fabricate their sexual harassment claims against Hanna. However, Hanna has provided [*20] no evidence of a conspiracy to fabricate claims. The fact that Williams, Bader, and Bryant had dinner together does not tend to prove that their claims were fabrications. Bryant had complained to Stout the day before the dinner occurred, and it is not clear that Bader ever made a sexual harassment claim against Hanna. Even if Bader did have a complaint against Hanna, it had not been brought to Pfizer's attention at the time the decision was made to have Hanna removed. More importantly, the majority of women making complaints against Hanna were not present at the dinner. Hanna thus has not demonstrated any link between Bryant's alleged discriminatory statements and the complaints of other employees against Hanna.

Hanna similarly has not provided any evidence that the sexual harassment claims were just a pretext for Pfizer's decision to have Hanna removed. Even if Bryant's claim was a fabrication motivated by prejudice, Foster, Whitesell and McCauley had received at least three other sexual harassment claims and knew of at least two additional women who were alleged to have been sexually harassed by Hanna at the time they made the decision. Hanna has not provided any evidence, other [*21] than his own denials, that their claims are false. In light of the numbers and seriousness of the allegations against Hanna, and the absence of evidence that Pfizer's reasons were pretextual, no reasonable jury could find that the sexual harassment claims were a pretext for having Hanna removed. A reasonable jury could not conclude, on the basis of statements allegedly made only by a single, non-supervisory employee, that Pfizer was motivated by prejudice.

Hanna has also provided no evidence that he was discriminated against on account of his gender, or retaliated against for having attempted to make use of dispute resolution mechanisms after Bryant allegedly made the prejudicial statements. Although Hanna did relay Bryant's statements to Price, his supervisor, there is no evidence that Hanna was attempting to initiate dispute resolution, that Price relayed the statements to anyone else, or that Price had any say in the decision to have Hanna removed. Other than the statements allegedly made by Bryant on a single occasion, Hanna has provided no evidence to support the claim that he had to endure a hostile work environment. Accordingly, Hanna's discrimination claim cannot survive summary [*22] judgment.

*Breach of contract*

In count two his complaint, Hanna alleges that InfoTech violated its employment contract with Hanna by wrongfully discharging him. [HN7] The general rule under Massachusetts law is that "an employment-at-will contract can be terminated at any time for any reason or for no reason at all." *Folmsbee v. Tech School Grinding Supply, Inc., 417 Mass. 388, 394, 630 N.E.2d 586 (1994)*; see also *Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9, 525 N.E.2d 411 (1988)*. The exception to the rule is that employees in certain circumstances can seek redress for terminations in violation of public policy. *Folmsbee, 417 Mass. at 394*. The employee can seek redress for public policy violations if the employee was fired "for asserting a legally guaranteed right (e. g., filing workers' compensation claim), for doing what the law requires (e. g., serving on a jury), or for refusing to do what the law forbids (e. g., committing perjury)." *Id.* (quoting *Smith-Pfeffer v. Superintendent of the Walter E. Fernald State School, 404 Mass. 145, 149-50, 533 N.E.2d 1368 (1989))*.

Hanna claims that his [*23] discharge was wrongful because the contract was not terminable at will. However, the initial contract between Hanna and Winter Wyman expressly provided that Winter Wyman could terminate the contract at will. Hanna understood this when he signed the agreement. The agreement extensions did not modify the terms of the original agreements, providing that "all other terms and conditions of the agreement stated above remain in effect." (1999 extension agreement.) Accordingly, Hanna's claim that his discharge was wrongful because the contract was not terminable-at-will fails.

Hanna also alleges that InfoTech wrongfully discharged him because his termination violated public policy. Specifically, Hanna alleges his termination violated public policy because he was fired on account of his national origin, ethnicity, or gender; and because he was discharged in retaliation for his good faith attempt to make use of the company's dispute resolution procedures. Both of these arguments fail because, as discussed above, Hanna was discharged for sexually harassing Pfizer employees. Hanna has submitted no evidence that he was discharged on account of his race, ethnicity, or gender, or for having made [*24] use of the dispute resolution mechanisms. Accordingly, defendants are entitled to summary judgment on count two.

*Breach of the covenant of good faith and fair dealing*

Case 3:02-cv-00691-CFD   Document 127-9   Filed 08/03/2007   Page 9 of 10

Page 9
2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

Count three of Hanna's complaint alleges a violation of the covenant of good faith and fair dealing, stating that "by its unlawful actions, in terminating the plaintiff's employment, InfoTech violated the covenant of good faith and fair dealing that is implied in every contract for employment." [HN8] The Massachusetts Supreme Judicial Court has held that a "bad faith" termination constitutes a breach of an at-will employment contract. *Fortune v. National Cash Register Co.*, 373 Mass. 96, 101-02, 364 N.E.2d 1251 (1977). However, no reasonable jury could find that InfoTech terminated Hanna in bad faith. As discussed above, InfoTech fired Hanna after its client complained that Hanna had harassed its employees on multiple occasions. Hanna has not produced any evidence rebutting InfoTech's good faith rationale for terminating him.

*Tortious interference with contract rights or financial expectancies*

Count four of Hanna's complaint alleges that Pfizer tortiously interfered with Hanna's contract rights by [*25] inducing InfoTech to break its contract with Hanna. [HN9] The Connecticut Supreme Court has made clear that not all conduct that disrupts a contract constitutes tortious interference. [2] *Blake v. Levy*, 191 Conn. 257, 260, 464 A.2d 52 (1983); *Weiss v. Wiederlight*, 208 Conn. 525, 535, 546 A.2d 216 (1988). "For a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation ...or that the defendant acted maliciously." *Blake, 191 Conn. at 261* (internal quotation marks and citations omitted); *Weiss, 208 Conn. at 535* (internal quotation marks and citations omitted). In Connecticut, the burden of establishing an improper purpose is on the plaintiff. *Blake, 191 Conn. at 262* ("In an action for intentional interference with business relations we think the better reasoned approach requires the plaintiff to plead and prove at least some improper motive or improper means.").

2 Connecticut law governs Hanna's tort claims.

[*26] Because Hanna has produced no evidence linking the prejudicial statements Bryant allegedly made to Pfizer's decision to request that InfoTech remove Hanna, and because Hanna has not otherwise been able to rebut Pfizer's non-discriminatory motive for its conduct, a reasonable jury could not conclude that Pfizer acted maliciously. Accordingly, summary judgment on count four is appropriate.

*Defamation*

Count six of Hanna's complaint alleges that "Pfizer's actions ...constituted false, malicious, willful, wanton, reckless, and/or negligent written and oral publications charging Hanna with sexual harassment ...." (Compl. P30 at 11-12.) [HN10] To prove that the defendants are liable for defamation, Hanna must establish that Pfizer and InfoTech published false statements that harmed him, and that the defendants were not privileged to do so. *Torosyan v. Boehringer Ingelheim Pharmaceuticals*, 234 Conn. 1, 27, 662 A.2d 89 (1995).

Outside of the vague description given in the complaint, Hanna has failed to provide any additional detail of the facts giving rise to his defamation claims against Pfizer and InfoTech. There is no evidence that either Pfizer or InfoTech relayed information [*27] regarding Hanna's termination to anyone outside of their respective companies, or that the information relayed within each company was not limited to that necessary to investigate the allegations against Hanna and to terminate him. (Hanna Dep. at 319-20.)

The allegedly defamatory statements made by the defendants were privileged. See *Miles v. Perry*, 11 Conn. App. 584, 529 A.2d 199 (1987) [HN11] ("It is for the court to determine, as a matter of law, whether the defendant made the defamatory statements while acting on an occasion of privilege ...."). [HN12] Statements made within each corporation, either to protect against sexual harassment or to review and terminate Hanna's employment are privileged. See *Johnson v. Chesebrough-Pond's U.S.A. Co.*, 918 F. Supp. 543 (D. Conn. 1996) ("To the extent plaintiffs are alleging that Johnson was defamed by intracorporate communications, we also note that such communications are protected by a qualified privilege. ... Communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege.") (internal quotation [*28] marks and citation omitted). Hanna acknowledges this proposition of law. (Mem. in Supp. of Obj. to Mot. 's for Summ. J. at 21 ("While a company attempting to shield its employees from sexual harassment enjoys a conditional privilege to take steps needed to accomplish this purpose, the privilege is lost where there is an improper motive lurking behind the statements.").)

[HN13] Under Connecticut law, "[a] conditional or qualified privilege may be abused or lost if the defendant published or broadcast the defamatory remarks with malice, improper motive, or bad faith." *Miles v. Perry*, 11 Conn. App. 584, 529 A.2d 199, 205 (1987). Contrary to Hanna's claim, there is no evidence that the defendants were acting in bad faith; they therefore did not lose their privilege. As discussed above, Hanna has provided no evidence either that he was terminated for any reason

Case 3:02-cv-00691-CFD   Document 127-9   Filed 08/03/2007   Page 10 of 10

2003 U.S. Dist. LEXIS 7056, *; 91 Fair Empl. Prac. Cas. (BNA) 1459

Page 10

other than for sexually harassing Pfizer employees or that he was in fact terminated on account of his race, ethnicity, or sex, or for invoking dispute resolution mechanisms. Therefore, there is no evidence from which a reasonable jury could conclude that the allegedly defamatory statements were not privileged, and summary [*29] judgment on count five is appropriate.

*Negligent infliction of emotional distress*

[HN14] To prove a claim of negligent infliction of emotional distress, Hanna must establish that InfoTech and Pfizer "knew or should have known that [their] conduct involved an unreasonable risk of causing emotional distress, and that the distress, if it were caused, might result in illness or bodily injury." *Buckman v. People Express, Inc., 205 Conn. 166, 173, 530 A.2d 596 (1987).* Conduct giving rise to a claim for negligent infliction of emotional distress must occur in the termination process. *Parsons v. United Technologies Corp., 243 Conn. 66, 88, 700 A.2d 655 (1997)* ("Negligent infliction of emotional distress in the employment context arises only where it is based upon unreasonable conduct of the defendant in the termination process."). However, "the mere act of firing an employee, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior," and therefore is not enough, by itself, to sustain a claim for negligent termination of employment." *Id. at 88-89* (internal quotation marks and citation omitted); *see also* [*30] *Perodeau v. City of Hartford, 259 Conn. 729, 751, 792 A.2d 752 (2002)* ("In cases where the employee has been terminated, a finding of a wrongful termination is neither a necessary nor a sufficient predicate for a claim of negligent infliction of emotional distress. The dispositive issue in each case was whether the defendant's conduct during the termination process was sufficiently wrongful that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that [that] distress, if it were caused, might result in illness or bodily harm.") (internal quotation marks and citations omitted).

In the present case, Hanna has not alleged, much less provided evidence, that the defendants took any actions giving rise to a claim for negligent infliction of emotional distress. Hanna's claim for negligent infliction of emotional distress, like his other claims, wholly arises from the fact that he was terminated. He has neither alleged facts nor provided evidence to support a finding that the manner in which he was fired could constitute negligent infliction of emotional distress. Because termination alone, even if wrongfully [*31] motivated, does not transgress the bounds of socially tolerable behavior, Hanna's claim for negligent infliction of emotional distress cannot survive summary judgment.

## CONCLUSION

For the aforementioned reasons, the Defendants' motions for summary judgment (Dkt. Nos. 41, 47) are granted. The clerk is instructed to close the file.

So ordered.

Dated at Bridgeport, Connecticut this    day of April 2003.

Stefan R. Underhill

United States District Judge