Feleke~1.txt

1

```
 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3
     ROBERT J. FELEKEY,              )
 4                 Plaintiff,        )        NO: 3:02CV691(CFD)
                                     )
 5   vs.                             )
                                     )        July 30, 2007
 6   AMERICAN TELEPHONE &            )
     TELEGRAPH COMPANY,              )
 7                 Defendant.        )        Volume I
     ─────────────────────────────
 8
 9                      450 Main Street
                       Hartford, Connecticut
10
                     T R I A L   B Y   J U R Y
11   B E F O R E:
               THE HONORABLE CHRISTOPHER F. DRONEY, U.S.D.J.
12
13   A P P E A R A N C E S:

14   For the Plaintiff       :     WILLIAM T. SHEA, ESQUIRE
                                    Shea & Cook
15                                  290 Pratt St., P.O. Box 1856
                                    Meriden, CT 06450
16
17   For the Defendant       :     VICTORIA WOODIN CHAVEY, ESQ.
                                    ERIC L. SUSSMAN, ESQ.
18                                  Day Pitney LLP
                                    242 Trumbull Street
19                                  Hartford, CT 06103
20
21
22
     Court Reporter     :          Martha C. Marshall, RMR, CRR
23
24
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

Page 1

Feleke~1.txt

☐

33

1   evidence.

2           THE COURT:  Mr. Shea?

3           MR. SHEA:  Well, your Honor, I think I'm trying to

4   move things along.  I'd be happy to have Mr. Felekey read

5   from it, but I think certainly on some of these exhibits it

6   would be easier if he was able to explain or paraphrase what

7   is in so many of the exhibits that came from -- that will be

8   offered throughout the course of this trial.

9           THE COURT:  Do you want him to read verbatim

10  parts of the letter to the jury?

11          MR. SHEA:  Those parts of the letter that deal

12  with her desire to have him come as an employee of the

13  company.

14          THE COURT:  Well, this is what I'll do.  I'll let

15  you have him read verbatim those portions of the letter that

16  you want him to, or you can ask him for his understanding of

17  the letter.

18  Q.   Can you read verbatim any of the portions of the letter

19  that concern the interest that AT&T had with you and in the

20  hiring process?

21  A.   Yes.  I'll just read the first paragraph.  It says:

22  Dear Bob.  It's addressed to me.  It says:  Dear Bob,

23  welcome to the final part of the Long Lines sales selection

24  process.

25  Q.   Let me interrupt you and explain to the members of the

Page 33

Feleke~1.txt

34

1  jury what long lines means?
2  A.   AT&T, in 1979, was one of the largest corporations in
3  the world, had 1.2 million employees.  The Long Lines
4  Division was the division that was responsible for long
5  distance.
6  Q.   When you say long distance, you mean telephone calls,
7  long distance telephone calls?
8  A.   Right.  You have a local company that connects the
9  phone up from your home into the national network, and AT&T
10  Long Lines is the national network that makes it possible
11  for you to call from one town to another and around the
12  world.
13  Q.   And it was the Long Lines network that you were being
14  recruited for?
15  A.   Yes, sir.
16  Q.   Go right ahead, sir.
17  A.   As we discussed, the exercises in which you will be
18  participating are intended to help ensure that individuals
19  considering a career in marketing have the interest and
20  qualifications necessary for long-term job satisfaction in
21  the marketing department.
22  Q.   Ms. Ogletree, what was her position, do you know?
23  A.   Ms. Ogletree was acting as a sales recruiter.  She was
24  in the -- I forget the actual name of the department -- it
25  was the department responsible for bringing new employees

Page 34

Feleke~1.txt

35

1   into the company for identifying candidates and bringing
2   them into the company.  She's a -- well, if I could see the
3   top of the screen, it has her job title.
4   Q.    And her job title?
5   A.    She's Management Employment Supervisor.
6   Q.    Where was her office located, do you know?
7   A.    She was at the regional office in Kansas City,
8   Missouri.
9   Q.    When you say the regional office, tell us a little bit
10  about the structure of AT&T as far as its various regions
11  were concerned.
12  A.    AT&T was a very large company, 1.2 million employees,
13  an it was almost a hundred years old in 1979.  So you could
14  imagine it developed quite a large bureaucracy and it also
15  had quite a few parallels to the United States military.
16  Everyone had a certain rank or salary grade.  Everybody
17  reported to some individual.  And it was very, very well
18  organized.  So the entire country was divided into a number
19  of regions.  At one point the number of regions changed, but
20  basically there was a mid-west region, a headquarter in
21  Kansas City, regional headquarters in Atlanta, one in
22  Chicago, one somewhere in California, which I never got to,
23  world headquarters in New York or New Jersey, depending upon
24  the time.  So regional headquarters designed to cascade the
25  instructions from AT&T world headquarters down to

Feleke~1.txt

36

1    individual.

2    Q.    Did Ms. Ogletree explain to you what the

3    responsibilities of a manager would be that she was

4    recruiting you for?

5    A.    Yes, in general terms.

6    Q.    And what were the general terms that she told you

7    about?

8    A.    She explained to me very briefly about AT&T, sort of

9    what I just told you, that it was already almost a hundred

10   years old, was a very large corporation, very well run.

11   That, as it says in this letter, there was really a give and

12   take in AT&T.  That the process for hiring was very long and

13   intensive, because they wanted to be very sure they found

14   the right person for the right job.  And as it says in the

15   letter, the company was concerned about long-term job

16   satisfaction of its employees.

17   Q.    How long did it take to complete this recruitment

18   process?

19   A.    I originally met with Dawn Ogletree on the Washington

20   University campus at the end of January in 1979, and I went

21   through a series of processes.  First, her interview, and

22   then follow-up conversation.  And then at this point now in

23   -- there were some correspondence back and forth in March as

24   to my availability for further development of the

25   discussion.  I was asked to go to Southwestern Bell, which

Feleke~1.txt

37

1    was the local company in St. Louis, to their employment
2    center to take some tests to see what my aptitude was, my
3    intelligence, if you will.
4    Q.   These were written tests, sir?
5    A.   Yes, sir.  And then at this point in the process, from
6    January now until April, I was asked to go to Kansas City to
7    take what they call an interest simulation.  So AT&T was a
8    very progressive company.  And although they did have a lot
9    of written testing, they had moved to a model where it was
10   what we call the fish bowl.  Which is like imagine you're a
11   goldfish and there's the bowl around you and there are five,
12   ten, a hundred people looking at you, the goldfish.  So they
13   would put you through various sorts of things to see how you
14   reacted not only to stress and being observed, but how you
15   might react in a real life situation.  This was a
16   simulation.
17   Q.   And that was carried out where?
18   A.   This particular simulation was done by a gentleman
19   named David Cousins at this regional office in Kansas City.
20   David Cousins and Dawn Ogletree worked together in that
21   office.
22   Q.   You traveled from St. Louis to Kansas City for this.
23   Was this on your own cost or was this company expense?
24   A.   No.  From the beginning AT&T was very generous, and
25   they asked you, as it says in the letter here later, to keep

Feleke~1.txt

38

1    track of all of your expenses, because AT&T will reimburse
2    you for them even though you're not an employee yet.
3    Q.    And that did occur?
4    A.    Yes, it did.
5    Q.    Now, tell us about -- you've taken us through several
6    months of this recruitment process.  Was there a time when
7    an offer was made to you?
8    A.    Yes.
9    Q.    And what was that and where was it made?
10   A.    Well, at one point in about June the company asked me
11   where would I be interested in working, and they gave me a
12   number of cities, basically corresponding with those
13   regional headquarters, that's where there was a lot of
14   employment occurring, and a few other cities, too, where
15   there were sales offices.  And my response was, well, I'm
16   here in St. Louis, I'm still a graduate student, and I've
17   lived here almost ten years now.  Can't you find me a job in
18   St. Louis.  And they said, yeah, we'll see if we can.  So
19   then they found a sales position in St. Louis, and then as
20   part of the process asked me to go to that sales office so I
21   could get a sense of what the real life employment would be
22   like at AT&T, to meet with Don Kalin, K A L I N, who was the
23   office manager there and get a tour of the office, and then
24   to meet with Ben Lubecki who could potentially be my first
25   boss.  He had a sales position available.

Feleke~1.txt

39

```
 1   Q.   And that offer was made to you and did you accept it,
 2   sir?
 3   A.   Yes.  After I went through that interview process, I
 4   received a formal letter offering me a salary at AT&T.  And
 5   I called back and I said, you know, it's been almost six
 6   months now we've been going through this process.  We're
 7   talking about a start date in July when the conversation
 8   began in January.  Number one, I'm glad I was employed by
 9   Washington University as a science writer throughout this
10   whole process.  And number two, I don't quite understand why
11   it takes so long.  So Dawn Ogletree explained to me, well,
12   we're really making a very large commitment here.  Most of
13   our employees stay here their entire career.  So we want to
14   make sures it's the best fit and that's why it takes so
15   long.  And as she says in her letter here, it's about mutual
16   satisfaction.  We want you to understand what your role and
17   responsibility is so you can perform satisfactorily.  And we
18   want you to be happy in this environment so you're not
19   looking for a job next year.
20   Q.   Did she talk to you about the security that you'd have
21   as an employee of AT&T?
22   A.   Yes, she did.  She explained that this was a long-term
23   job satisfaction situation.
24   Q.   Did she ever use the term at will, that you were going
25   to be an employee that could be terminated for any reason at
```

Feleke~1.txt

1    any time?

2    A.    No, sir, she did not.

3    Q.    Did she -- what was her discussion with you, as the

4    recruiter, was her discussion relative to the long-term

5    commitment that you were making and the company was making

6    to you?

7    A.    Yes.

8    Q.    And, Mr. Felekey, did you have any thought at that time

9    about whether or not you wanted to tie yourself up for a

10   long-term commitment as an employee of AT&T?

11   A.    Yes.  After, you know, almost six months of being

12   recruited, I had two questions.  One, is everything going to

13   take this long at AT&T.  And, two, why the starting salary

14   was so low.  Because now I was about halfway through my

15   master's degree program and this would be my fourth job out

16   of college and it was less than I was being paid as a

17   science writer with all the security in the world working

18   for Washington University.  And she explained to me that you

19   have to trust us, Bob.  When I tell you that this is a

20   starting salary, it's a starting salary.  I can also tell

21   you that a person of your qualifications can expect a long

22   and healthy career at AT&T.  And furthermore, the way the

23   company works is there's a series of progressions.  If you

24   perform adequately and, you know, sometimes you have to be a

25   little lucky, too, you can expect a series of progressions

Feleke~1.txt

41

1    in pay and in responsibility and in level throughout your

2    career at AT&T.

3         And based upon, you know, six months of getting to know

4    Dawn and seeing the Kansas City office and meeting the

5    people there who all seemed very satisfied, many of whom had

6    been there 20, 30 years, and the St. Louis office where I

7    was supposed to work who seemed very satisfied, has a clean

8    environment, very safe.  A number of those people had been

9    there 20, 30 years, it seemed a viable alternative to

10   staying at Washington University and give me a chance maybe

11   ultimately to see the rest of the world.

12   Q.   Did you have any personal feelings about whether or how

13   important that kind of offer as far as security was

14   concerned was to you?

15   A.   Well, of course, I had moved away from home to attend

16   Washington University in 1972, and my parents would drive

17   the fourteen hours to come and visit.  We kept in close

18   touch in the early stages of my career.  And I wouldn't make

19   a decision this big without talking to my parents.  I mean,

20   we talked about every week.

21   Q.   Did you have discussions with your parents?

22   A.   Yes, I did.

23   Q.   As a result of those discussions, did you come to a

24   conclusion as to your future work and the offer by AT&T for

25   a job?

Feleke~1.txt

49

1    rule.

2         THE COURT:  You're not claiming that then,

3    Mr. Shea?

4         MR. SHEA:  Yes, I'm going to claim that someone

5    spoke to you --

6         THE COURT:  Before you ask him a question, I need

7    to resolve the objection.  Do you claim that part of the

8    answer or you're going to ask him a different question?

9         MR. SHEA:  I'm going to claim, your Honor, that he

10   was informed by the company officials as to the policy of

11   the company and the code of conduct of the company and what

12   it meant.  And that, I believe, is appropriate and I would

13   claim that as --

14        THE COURT:  And the objection is that the best

15   evidence of the code of conduct is the code of conduct

16   itself, is that right?

17        MS. CHAVEY:  Yes.

18        MR. SHEA:  Your Honor, the code of conduct has

19   been changed so many times, I'm not sure what counsel is

20   referring to as to which code of conduct and which document

21   the code of conduct consisted of.  The testimony will be

22   that the code of conduct has started out with one page and

23   is probably now a book as large as any of the books around

24   here.

25        THE COURT:  I'm going to sustain the objection as

Page 49

Feleke~1.txt

50

1    to the best evidence rule, but I'm going to permit you to

2    ask him about any representations or statements that were

3    made by him -- to him by AT&T employees at that time and

4    give Ms. Chavey an opportunity to object to those particular

5    questions.

6    BY MR. SHEA:

7    Q.    Mr. Felekey, were any representations made to you as to

8    what responsibility you had relative to the code of conduct

9    in 1979?

10   A.    Yes.

11   Q.    And what were they?

12   A.    The company officials that I met with said, you know,

13   let's keep it simple, Bob.  This is a very complicated thing

14   you're entering in terms of career, the technology's

15   complicated.  The company's a very big bureaucracy.  But it

16   all boils down to this.  There are three things that you

17   must avoid to have continued employment at AT&T.  The first

18   is do not damage any company equipment.  Specifically, the

19   network, which is the heart of our business.  People need to

20   make phone calls 24 hours a day, 365 days a week.  If you

21   get caught damaging the network, in particular, or anything

22   as simple as, you know, company equipment in general.  But

23   they were very concerned about this huge computerized

24   network.  Then that's grounds for being fired.

25         Number two.  Our financial systems are unique as a

Feleke~1.txt

51

1    telephone company and everything has to be approved by the
2    Federal Government as well as state and local officials.  If
3    you get caught in any kind of financial irregularity, we
4    will fire you.
5            And the third was -- I guess it's what you'd call
6    today sexual harassment.  It was presented in other terms in
7    those days, but they said if you get caught basically
8    fooling around with a member of the opposite sex while on
9    the job, we will fire you.
10            If you avoid those three things, then you can
11    expect to have a long career at AT&T.  And AT&T is very
12    generous in its retirement policies.  And welcome to AT&T.
13    Q.    At that time, in 1979, AT&T had a very substantial
14    number of female employees, did they not?
15    A.    Yes, they did.
16    Q.    And almost every AT&T facility had numbers and numbers
17    of operators who were female, is that correct?
18    A.    Yes.  The operator ranks at that time were primarily
19    female, but when I went off to training I was pleasantly
20    surprised that the people around me in the training, all
21    these new recruits, were very much like the people I had
22    gone to college with.  I mean, there were pretty much equals
23    numbers of men and women.  They were all very bright and
24    shinny.  They were all very interesting individuals.  And
25    they are all interested in having a long-term career and,

Feleke~1.txt

52

1    therefore, doing the best they could.  Learning this
2    material was very competitive, taking the tests, and a lot
3    of comradery from the first day throughout the first six
4    weeks of training.
5    Q.   But the comradery that you saw was discussed with each
6    of these perspective employees as to the code of conduct, in
7    other words, the actions of both men and women in the
8    company?
9    A.   Yes.
10   Q.   And if there was a violation of that code of conduct,
11   that was a basis for termination?
12   A.   That's correct.
13   Q.   Was there anything else that was told to you about a
14   basis for termination?
15   A.   No, nothing in particular.  It's implied that you come
16   to work and do a job, and that's what I expected to do.
17          MS. CHAVEY:  Objection.
18          THE COURT:  Nature of the objection?
19          MS. CHAVEY:  The latter part of Mr. Felekey's
20   answer was not responsive.  I think the question was about
21   what he had been told.  And part of his response related to
22   what he had inferred.
23          THE COURT:  Mr. Shea, you claim that part of the
24   answer?
25          MR. SHEA:  I believe, your Honor, it's responsive

Page 52

Feleke~1.txt

⬜

66

1   have some questions for Mr. Felekey relative to the scope of
2   the training that was given and the individual who gave it.
3           THE COURT:  Anything else about you, Ms. Chavey?
4           MS. CHAVEY:  The other thing I would add, part of
5   my objection in the last round of questioning related, in
6   part, to the fact that the individuals were not identified,
7   it was more of a group reference.  And it's difficult for us
8   to know whether that's hearsay or not if we don't know who
9   it is by name or any other identification.
10          THE COURT:  That's a fair request, Mr. Shea.  I've
11  already ruled on that too.  I don't want to hear general
12  statements by people unidentified.  If he's got some
13  evidence of people who have that responsibility within AT&T
14  at that time and who made such statements to him concerning
15  job security, he's got to tell us who the speaker was and
16  general time frame and the general circumstances of that so
17  that I can see if it fits within that section of Rule 801.
18          MR. SHEA:  We have no problem with that, your
19  Honor.
20          THE COURT:  We'll be in recess then.
21          (Recess.)
22          THE COURT:  Are we ready for the jury?
23          MR. SHEA:  Yes, we are.
24          THE COURT:  May we have the jury, please.
25          Mr. Felekey, why don't you get on the stand for us

Feleke~1.txt

67

1    before we have the jury come in.

2              (Jury in at 11:52, a.m.)

3              THE COURT:  You may be seated.  Good morning

4    again.

5              The objection is sustained.

6              Further direct examination, Mr. Shea.

7              MR. SHEA:  Thank you, your Honor.

8    BY MR. SHEA:

9    Q.   Mr. Felekey, I'd like you to go back in your memory to

10   your training in Cincinnati.  Who was responsible?  Who was

11   the individual of the company indicated was chiefly

12   responsible for that training?

13   A.   Frank Ricardo was a senior training manager at the

14   Cincinnati center.

15   Q.   And what were the areas that Mr. Ricardo presented to

16   you and your fellow students during that period of time in

17   Cincinnati?

18   A.   Mr. Ricardo had come in from the field to orient us and

19   train us in the national policies, procedures, services,

20   products of AT&T.

21   Q.   And did that include the technology that you would be

22   involved with in your sales responsibilities?

23   A.   Most definitely.

24   Q.   And, now, as far as the relationship between you as an

25   employee and the corporation, did Mr. Ricardo cover that in

Feleke~1.txt

68

1    his instructions or discussions with the students in the

2    Cincinnati training program?

3    A.   Yes.  On day one, in the introduction to why we're

4    there and what we're going to do, Mr. Ricardo explained that

5    even though our --

6            MS. CHAVEY:  Objection.

7            THE COURT:  Just a second.  I think that calls for

8    a yes or no answer.  Is that the nature of your objection,

9    Ms. Chavey?

10           MS. CHAVEY:  It is, yes.

11           THE COURT:  And there was an answer yes.  So I'll

12    sustain the objection to the balance of that answer.  You

13    can ask another question, though.

14    Q.   Did Mr. Ricardo instruct you in the Cincinnati training

15    program?

16    A.   Yes.

17    Q.   And what were the areas in which he actually covered as

18    company representative in training you and your fellow

19    students?

20    A.   He explained that the company had designated him

21    basically a role model, and by the end of our our training

22    we should be pretty much like him in terms of our AT&T

23    behavior.

24    Q.   And did he explain what he considered the role model

25    that he expected you all to be?

Feleke~1.txt

80

1   Common Bond is AT&T's revised worldwide code of conduct.  It
2   is both a guide to help each of us resolve ethical dilemmas
3   in an increasingly complex --
4             THE COURT:  You have to slow down, please.
5             THE WITNESS:  I'm begin again.  Dear Colleague --
6             THE COURT:  The jury has it in front of it.  They
7   have it displayed.  Is there any need for the witness to
8   read it to them then?  I'll give you a chance to have the
9   jury read it to themselves if you'd like.
10            MR. SHEA:  I think that would probably be of
11  assistance to the jury.
12            THE COURT:  I'll ask the jury to read that page
13  that's displayed.
14            MR. SHEA:  I'm sorry?
15            THE COURT:  I've got to leave that on the screen.
16            MR. SHEA:  I understand, your Honor, that I can't
17  pick these up.
18            THE COURT:  Just leave it like that for a second.
19  That should be good.  Yes, they can read it.  Just give us a
20  minute, Mr. Shea.  Just don't touch anything for a second,
21  Mr. Shea.
22            MR. SHEA:  I kind of wish my grandson were here
23  right now, your Honor.
24            THE COURT:  Okay.  You have another question,
25  Mr. Shea?

Feleke~1.txt

⬜

81

1    BY MR. SHEA:

2    Q.   Mr. Felekey, throughout this code of conduct and common

3    bond, what did you understand from the years of experience

4    that you had with AT&T what the responsibility was of the

5    employee to the company and the company to the employee?

6    A.   The common bond is what the employee and the company

7    share, that's the meaning of common and bond.  And these

8    are, let's say, an overall summation of the rules and

9    regulations that guides AT&T's business conduct.  And each

10   individual employee is the living, breathing part of the

11   company that needs to follow these guidelines or else.

12   Q.   Let's go back to Mr. Ricardo in Cincinnati.  Did he

13   discuss with you and your fellow students the common bond or

14   the code of conduct, as they call it, at that time?

15   A.   Yes.

16   Q.   And what was basically what you were told by

17   Mr. Ricardo relative to whether job security had anything to

18   do with the common bond or the code of conduct?

19   A.   He explained to us in the introduction to the class

20   that as new employees you are bound by the common bond which

21   is AT&T's statement to you of the grounds for dismissal.

22   Q.   And that was the -- that was if you violated any of

23   those common conduct responsibilities, that could lead to

24   dismissal?

25   A.   Exactly.

Page 81