Feleke~1.txt

☐

```
1            MS. CHAVEY:  Objection.
2            THE COURT:  Nature of the objection?
3            MS. CHAVEY:  Leading.
4            THE COURT:  Objection sustained.
5   Q.   I think you've answered the question, Mr. Felekey.
6   Let's move on.
7            THE COURT:  There was an answer given to that
8   question to which I sustained the objection.  I'm going to
9   tell the jury to disregard that answer then.
10  Q.   Mr. Felekey, after you finished up your Cincinnati
11  training, were you judged by the people or Mr. Ricardo, who
12  was the senior person, as to your competency to go back to
13  St. Louis to the job that you were apparently going to be
14  assigned to?
15  A.   Yes.  I understand a letter was sent to my boss and I
16  received a certificate of completion for integrated account
17  selling skill.  And I think the last words were you're
18  ready, go get them.
19  Q.   Now, once you went back to St. Louis, tell us just what
20  you were doing for AT&T in the St. Louis office or in the
21  St. Louis territory relative to the new sales
22  responsibilities that you had?
23  A.   Right.  At this point I was ready on a theoretical
24  academic basis to begin doing my job.  Part of the
25  acculturation of AT&T is they don't send anybody out alone
```

Feleke~1.txt

90

1  would have to actually choose a long distance carrier. It's
2  still true today, although it happens automatically when you
3  get a telephone and most people don't pay attention. But
4  this is when it started, in '84. So the title of this group
5  was Carrier Selection, choose your long distance carrier.
6  Select a long distance carrier. And Kathy Hare was
7  responsible for some of the midwest in terms of getting
8  people to fill out a form to either keep AT&t as a long
9  distance service forever or change to another company.
10 Q.   Did that affect you?
11 A.   Yes. After the luncheon, you know, we had business
12 lunch all the time, mostly with clients, occasionally with
13 other managers at AT&T, but business lunch was a way of
14 doing business at AT&T within budget guidelines. And after
15 the meeting I asked Ben, I said, well, that was interesting,
16 but what does it have to do with me? Why did you introduce
17 me to Kathy Hare? He said, because she has a job available
18 as the Carrier Selection manager for Missouri and she was
19 thinking about offering it to you if you're qualified and if
20 you have an interest.
21 Q.   Did you feel you were qualified?
22           MS. CHAVEY:  Objection, it's irrelevant.
23           THE COURT:  I'll allow it. You can answer that
24 question.
25 A.   Yes.

Feleke~1.txt

```
1   Q.   What happened?
2   A.   I said, well, Ben, I'm perfectly happy here.  It's been
3   five years now.  I've won several national awards.  All the
4   promises have been made to me in terms of pay have been
5   taking place.  I'm now making at least twice what I was
6   making five years ago.  I bought a house here in the St.
7   Louis area.  And I think our relationship's going well and
8   the rest of the team.  What are you doing?  And he said,
9   well, you can't spend your whole career here on my team.
10  You've got tremendous potential.  Go out and live your life
11  and get promoted and have a career at AT&T.
12  Q.   Had your own life changed at that time?
13  A.   In 1984 -- by 1984 I had purchased a home and then I
14  had gotten married.
15  Q.   You say you purchased a home.  Did that have anything
16  to do with the company?
17  A.   Well, actually, it did.  You know, when you work for
18  AT&T, you're an AT&T employee 24 hours a day and you find
19  who you can trust and you build relationships.  And Ben
20  Lubecki was my boss and my local role model.  And one day he
21  came up to me and said, by the way, Bob, are you renting.  I
22  said, yeah.  He says, that's stupid.  I said, what do you
23  mean.  He says, well, you're going to be here a long time.
24  You have to figure out how the tax thing works and you're
25  just throwing away your money with rent.  Why don't you buy
```

Feleke~1.txt

1  a home. Some day you're going to get married. That part
2  didn't cross my mind. Tell me about the financial side. He
3  says, there's all kinds of opportunities within AT&T to
4  acquire property and you want to be a homeowner, not a
5  renter. I said, well, tell me more. And he gave me some
6  phone numbers. And what I discovered was the company
7  relocation program, which I hadn't experienced at this
8  point, but would later, provide all kinds of benefits to
9  employees. For example, if you had to move quickly to take
10 another assignment in another physical location and you
11 couldn't sell your home, the company would buy it from you.
12 And so Ben put me in touch with people who had a list of
13 homes that the local company, Southwestern Bell, also part
14 of AT&T, physically own. They had moved some managers
15 around and they were left holding their homes. And so you
16 could get these at a very reasonable price. And I began to
17 explore what homes were on the market and I bought a home
18 from the bank that was holding the mortgage that AT&T,
19 Southwestern Bell, had acquired from an employee who had
20 moved.
21         THE COURT: Could I just see counsel at side-bar
22 for just a second, please.
23         (Whereupon, the following conference was held at
24 side-bar.)
25         THE COURT: Mr. Shea, I think we're letting him

Feleke~1.txt

104

```
1   Q.   Who was that?
2   A.   Ken Paape, P A A P E.
3   Q.   What was his job?
4   A.   He was in charge of the National Business Carrier
5   Selection Program.
6   Q.   And so there was a selection that was across the entire
7   United States for picking a long distance company, is that
8   correct?
9   A.   Right, for businesses and residences.
10  Q.   How long did you do that?
11  A.   Two years.
12  Q.   And tell us what the results were.
13  A.   We exceeded Wall Street analysts market share estimate
14  by about 10 percent.
15  Q.   And did the company recognize you for the work that was
16  done?
17  A.   Yes.  And they declared victory and decided to
18  dismantle the group.
19  Q.   I'm sorry.  I didn't hear you.
20  A.   Yes.  They were appreciative of the job we'd done,
21  called it a great success, and dismantled the group.
22  Q.   In other words, that job was then completed?
23  A.   That's correct.
24  Q.   And were you given a bonus as a result of that work
25  that you did at headquarters?
```

Page 104

Feleke~1.txt

105

1   A.   Yes, I was.
2   Q.   Now, what was the next step that you had as far as AT&T
3   was concerned?
4   A.   Well, I started working my way up and down the halls of
5   world headquarters at AT&T looking for the next opportunity
6   before the old one completely ended.
7   Q.   And that was always considered to be the responsibility
8   of the employee, is that correct?
9   A.   Yes.
10  Q.   So you did that. What happened?
11  A.   I met -- well, I became reacquainted with a fellow by
12  the name of Dave Schmieg, S C H M I E G, who, turns out, was
13  Kathy Hare's former boss. So I was able to make a
14  connection and he had a job opening.
15  Q.   During this period of time, did any of these people
16  that you've just testified to who either -- Kathy or the
17  people that you worked for in the national, did they make
18  any references to you as to your career, the future career
19  that you would have with the company?
20  A.   They were evaluating me and offered me these positions
21  for some period of time in the future.
22  Q.   And what were your evaluations during this period of
23  time?
24          MS. CHAVEY:   Objection.
25          THE COURT:   Nature of the objection?

Feleke~1.txt

106

1         MS. CHAVEY: The objection is based on the fact I
2    think the question's asking for evaluations that would be
3    reduced to documents, but we don't have the documents.
4         THE COURT: Mr. Shea.
5         MR. SHEA: Your Honor, we'll offer -- we will
6    offer the document, but I'm just trying to shorten this up.
7    We have, I think, there's probably 20 years of evaluations
8    that Mr. Felekey -- we have been able to obtain that was
9    done for Mr. Felekey. What I would like to know is during
10   this period this period of time, if he knows, whether he was
11   evaluated and generally what those evaluations were.
12        THE COURT: Objection's overruled. You can answer
13   that question.
14   A.   Yes. Annually I was appraised and evaluated. And if I
15   exceeded or far exceeded my targets, I received a bonus.
16   Q.   And did you receive a bonus every year?
17   A.   I did.
18   Q.   Now, so you obtained a responsible job with Ms.
19   Schmieg?
20   A.   Schmieg, yes.
21   Q.   And what were you doing then?
22   A.   I became the Staff Manager in Consumer Communication
23   Services and we developed a program called AT&T Opportunity
24   Calling.
25   Q.   Well, tell us in simple words what all those -- that

Feleke~1.txt

152

```
1            THE COURT:  Objection's already been ruled on.
2            MR. SHEA:  I'm sorry, I didn't hear that ruling.
3            THE COURT:  The objection's sustained as to the
4    exhibit.
5    Q.  Do you know how many people were interviewed for this
6    job?
7    A.  Seven or eight.
8    Q.  And you were selected?
9    A.  Yes, I was the best available candidate.
10           MS. CHAVEY:  Objection.  There's no foundation for
11   Mr. Felekey's personal knowledge of that.
12           THE COURT:  I'll allow the answer.  Objection's
13   overruled.  Make sure you answer the questions that are
14   asked of you Mr. Felekey, please.
15   Q.  Mr. Felekey, when did you start with the ITT account?
16   A.  In early January of 1996.
17   Q.  And did you relocate to West Hartford or to Farmington
18   area?
19   A.  Well, I began working in Connecticut in January of 1976
20   while my family remained behind in St. Louis -- I'm sorry,
21   in New Jersey now.  We moved around so much with the
22   company.
23           THE COURT:  You said '76.  Did you mean to say
24   '96?
25   A.  I'm sorry, yes.  Let me start over again.  In 1996, in
```

Feleke~1.txt

153

1   January, I began working in my position in the Farmington
2   branch. My family, two sons and my wife, remained behind in
3   New Jersey until my sons could complete the 8th grade. We,
4   the four of us, moved into our home in West Hartford in July
5   of 1996.
6   Q.   Mr. Felekey, I don't want you to go into a lot of
7   detail about the purchase of your home in West Hartford, but
8   were you involved with the company in that?
9   A.   Yes.
10  Q.   And what did they do to assist you?
11  A.   The company assisted in every way. The company
12  assisted in all the financial aspects of relocation and
13  purchasing a home, from giving us a preferred vendor for our
14  mortgage.
15  Q.   What do you mean, a preferred vendor?
16  A.   Well, a mortgage company had gained AT&T's agreement to
17  partner together and they offered preferential rates to AT&T
18  employees and, in fact, a rebate after the mortgage was
19  completed.
20  Q.   Was there anything that was required that you know of
21  as to AT&T stating to the mortgage company that you would be
22  employed with the company for any future period of time?
23  A.   I know that mortgage companies check the stability of
24  employment before they issue a mortgage.
25  Q.   And what kind of a mortgage did you get?

Feleke~1.txt

0

154

1   A.   A 30 year mortgage.
2   Q.   30 year mortgage?
3   A.   Yes, sir.
4   Q.   Before you got that, you say you know that they checked
5   with AT&T as to whether or not you would have stability of
6   employment?
7   A.   Yes.
8           MS. CHAVEY:  Objection.  Again, there's no
9   foundation for Mr. Felekey's knowledge of communications
10  between AT&T and the mortgage company.
11          THE COURT:  I believe it was already asked and
12  answered, wasn't it, Mr. Shea?  So I overrule the objection
13  on that basis.  The answer may stand.
14  Q.   Now, tell us about the job.  You came to Farmington,
15  Connecticut, living in West Hartford.  What was the job that
16  you had in the Farmington office?
17  A.   Well, I expected the job was going to be like the one I
18  had in National Account Sales, because I was back in a
19  similar position, but now called Global Account Sales.  The
20  difference being I'd be responsible for the same one
21  customer by name at least, but now worldwide.  So I was
22  responsible for basically any company that could claim some
23  connection to ITT worldwide.
24  Q.   You say -- you referred to Global Sales?
25  A.   Yes.

Feleke~2.txt

```
                                                                    220




 1   UNITED STATES DISTRICT COURT

 2   DISTRICT OF CONNECTICUT

 3
     ROBERT J. FELEKEY,           )
 4              Plaintiff,        )           NO: 3:02CV691(CFD)
                                  )
 5   vs.                          )
                                  )           July 31, 2007
 6   AMERICAN TELEPHONE &         )
     TELEGRAPH COMPANY,           )
 7              Defendant.        )           Volume II

 8

 9                        450 Main Street
                        Hartford, Connecticut
10
                    T R I A L   B Y   J U R Y
11   B E F O R E:
             THE HONORABLE CHRISTOPHER F. DRONEY, U.S.D.J.
12

13   A P P E A R A N C E S:

14   For the Plaintiff      :     WILLIAM T. SHEA, ESQUIRE
                                   Shea & Cook
15                                 290 Pratt St., P.O. Box 1856
                                   Meriden, CT 06450
16

17   For the Defendant      :     VICTORIA WOODIN CHAVEY, ESQ.
                                   ERIC L. SUSSMAN, ESQ.
18                                 Day Pitney LLP
                                   242 Trumbull Street
19                                 Hartford, CT 06103

20

21

22
     Court Reporter         :     Martha C. Marshall, RMR, CRR
23

24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.



                              Page 1
```

Feleke~2.txt

0

307

1   Weijer's signature?
2   A.   It does.
3   Q.   There is a place for your signature, is there not?
4   A.   Yes.
5   Q.   Did you sign it?
6   A.   I did not.
7   Q.   You did not enter into that agreement?
8   A.   I not enter into that agreement.
9   Q.   Can you tell us what in essence that agreement was as
10  you understood it?
11  A.   It asked me to forever give up any rights to damages
12  against AT&T.
13  Q.   And you refused to do that?
14  A.   I did.
15  Q.   And this lawsuit was a result of that --
16  A.   It is.
17  Q.   -- decision?
18  A.   Yes, sir.
19           MR. SHEA:  I would offer that, your Honor.
20           THE COURT:  That's Plaintiff's Exhibit 7, Mr.
21  Shea?
22           MR. SHEA:  Exhibit 7.
23           MS. CHAVEY:  We have no objection.
24           THE COURT:  Then Plaintiff's Exhibit 7 may be made
25  a full exhibit.

Feleke~2.txt

308

```
 1         (Whereupon, Plaintiff's Exhibit Number 7 was
 2   marked in full.)
 3   Q.   Mr. Felekey, during the 20 years and seven months that
 4   you were employed by AT&T, was there any time prior to the
 5   actions of October 15th, 1999, and the submission of the PIP
 6   prepared by Mr. Weijer, was there any time during all those
 7   years that your performance was ever criticized by any of
 8   your managers or by the company?
 9   A.   No, sir.
10   Q.   During that period of time, was there any discussion
11   between you and your superiors as to any -- what the Cause
12   could be for termination of your employment?
13   A.   Yes, sir.
14   Q.   And do you know who those people were that were your
15   managers that you had those discussions with?
16   A.   Yes.  Each manager I had was required to give me a copy
17   of the code of conduct.
18   Q.   Did you have a discussion with the manager relative to
19   the code of conduct?
20   A.   Not every year, but many years, yes.
21   Q.   And did the discussions concern any basis for
22   termination of your employment as a manager in AT&T?
23   A.   Yes.
24   Q.   And what was the basis that was explained to you by
25   those managers?
```

Page 89

Feleke~2.txt

309

```
 1   A.   Of course, you needed to do your job.  That is a basis
 2   of the relationship with the company.  Then you needed to
 3   avoid destroying the network equipment or any AT&T
 4   equipment.  You needed to avoid any financial irregularities
 5   that would affect the company's books.  You needed to avoid
 6   any sort of what became known as sexual harassment.
 7   Q.   And were you ever criticized by any of your managers
 8   relative to any alleged violation of that code of conduct?
 9   A.   No, sir.
10   Q.   And during the period of time that you worked for AT&T
11   as a manager, was this code of conduct also referred to by
12   another name?
13   A.   Yes.
14   Q.   And what was that?
15   A.   In recent years it was called our common bond.
16   Q.   And that was our common bond and who did it refer to?
17   A.   It described the relationship between employees and
18   AT&T.
19   Q.   And did you feel during the period of time that you
20   were employed by this company, AT&T, that you had a
21   contractual relationship with them?
22            MS. CHAVEY:  Objection.  This is opinion.
23            THE COURT:  You claim that, Mr. Shea?
24            MR. SHEA:  I claim it, your Honor.
25            THE COURT:  Objection sustained.
```

Feleke~2.txt

310

1  Q.  What kind of a relationship did you believe that you
2  had with your employer, AT&T?
3  A.  On a regular basis the company would ask me to do
4  something and offered me a reward if I did it. I did it and
5  they rewarded me.
6           MS. CHAVEY:  Objection. The answer was not
7  non-responsive.
8           THE COURT:  I agree. That's sustained. I'm going
9  to tell the jury to disregard that answer.
10 Q.  What kind of legal relationship did you believe that
11 you had with your employer?
12          MS. CHAVEY:  Objection, again, on the same
13 grounds. This calls for opinion.
14          MR. SHEA:  I claim that, your Honor.
15          THE COURT:  Sustain the objection, because you
16 asked him what kind of legal relationship. He can answer
17 the original question, which he gave a non-responsive answer
18 to, which is what kind of a relationship did he believe that
19 he had with AT&T. He can answer that question.
20 Q.  Mr. Felekey.
21 A.  The relationship I had with AT&T was that I joined the
22 company to spend my career at AT&T, and that if I fulfill my
23 obligations to the company they would provide for my
24 retirement at the end of my career.
25          MR. SHEA:  I have nothing further, your Honor.

Page 91